UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TUSCOLA WIND III, LLC,

                    Plaintiffs,                    Case No. 17-cv-10497

v                                      Honorable Thomas L. Ludington

ALMER CHARTER TOWNSHIP, et al,

                    Defendants.

_____/

## OPINION AND ORDER AFFIRMING THE DECISION OF THE ALMER CHARTER TOWNSHIP BOARD OF TRUSTEES

On February 15, 2017, Plaintiff Tuscola Wind III, LLC, ("Tuscola") filed a complaint naming the Almer Charter Township and that Township's Board of Trustees as Defendants. ECF No. 1. Count One of the Complaint is the "Claim of Appeal." Compl. at ¶¶ 100–124. Tuscola Wind's claims arise out of Defendants' denial of a Special Land Use Permit ("SLUP") that would have permitted Tuscola Wind to construct the "Tuscola III Wind Energy Center" in Tuscola County, Michigan. Compl. at 6. Oral argument on the claim of appeal was held on October 5, 2017. For the following reasons, the Board of Trustee's denial of the SLUP will be affirmed.

## I.

Tuscola Wind III, LLC, is a Delaware limited liability company, which is indirectly wholly owned by NextEra Energy Resources, LLC. Tuscola Wind SLUP App. at 1, ECF No. 30, Ex. B. Tuscola is attempting to build the "Tuscola Wind III Energy Center" in Tuscola County, Michigan. *Id.* The project, if completed, would include 55 wind turbines in Fairgrove, Almer, and Ellington Townships, and would produce enough energy to supply 50,000 homes with wind energy. *Id.* In its SLUP application, Tuscola explained that "[t]he Project facilities are to occupy 15.2 acres of land, and will be serviced by 6.6 miles of access roads, occupying 12.9 acres of land." *Id.* at 2.

Prior to submitting the SLUP application, Tuscola had entered into agreements with 87 landowners (representing 192 parcels of land) for the use of their property for the project. *Id.* Those individuals are described as "participating landowners." *Id.* Thus, at the time the SLUP application was submitted, Tuscola had already identified the ideal number of and locations for wind turbines in Almer Township, categorized parcels of land as necessary or unneeded, and secured access to the parcels it believed were required for the proposed project. The present dispute centers on Tuscola's attempt to secure SLUP approval for the 19 wind turbines that Tuscola wishes to build in Almer Township.

### A.

The Almer Township Zoning Ordinance characterizes wind energy systems as special land uses. As such, Tuscola was required to seek a Special Land Use Permit ("SLUP") from the Township for the project. *See* Almer Zoning Ord. Art. 24, ECF No. 30, Ex. A. Pursuant to Section 2401 of the Zoning Ordinance, the first step in receiving approval for a wind energy system is to submit a SLUP application to the Township's Planning Commission. *Id.* at § 2401. Upon receipt of the application, the Planning Commission is required to hold a public hearing within 45 days. *Id.* After the public hearing, the Planning Commission recommends either granting or denying the application to the Township Board and must state its reasons for the decision. *Id.* Once the Planning Commission issues its recommendation, the Township Board will render a decision on the SLUP application. *Id.*

Section 1522 of the Almer Township Zoning Ordinance provides special requirements for SLUP applications involving a wind energy system. *Id.* at § 1522. Among other things, the applicant must provide an escrow account to cover the Township's costs and expenses associated with the SLUP zoning review and approval process. *Id.* at § 1522(C)(1). Likewise, the applicant

must fund and submit environmental and economic impact studies (if requested by the Township). *Id.* at § 1522(C)(2)–(3). The application must include a site plan which specifies the design characteristics of the turbines, safety features, security measures, and a lighting plan. *Id.* at § 1522(C)(4).

> The Zoning Ordinance also addresses noise emissions from the turbines:

> Noise emissions from the operations of a [Wind Energy Conversion System] shall not exceed forty-five (45) decibels on the DBA scale as measured at the nearest property line of a non-participating property owner or road. A baseline noise emission study of the proposed site and impact upon all areas within one mile of the proposed WECS location must be done (at the applicant's cost) prior to any placement of a WECS and submitted to the Township. The applicant must also provide estimated noise levels to property lines at the time of a Special Use application.

*Id.* at § 1522(C)(14).

Similarly, "[a]ll efforts shall be made not to affect any resident with any strobe effect or shadow flicker." *Id.* at § 1522(C)(20).

And the Zoning Ordinance provides the general admonishment that "[t]he wind energy conversion system shall not be unreasonably injurious to the public health and safety or to the health and safety of occupants of nearby properties." *Id.* at § 1522(C)(7).

**B.**

On September 23, 2016, Tuscola submitted its SLUP application to the Almer Township Planning Commission. Several portions of the application became points of contention between Tuscola and the Planning Commission. Those sections will be summarized.

In the SLUP application, Tuscola referenced three studies which analyzed the "impact wind farms have on property values." SLUP App. at 10. Each study found no evidence that wind farms have a statistically significant impact on nearby property values. One study, conducted by the Lawrence Berkeley National Laboratory, analyzed home sales near 67 wind facilities across nine

states. *Id.* Another study, conducted by the University of Rhode Island, analyzed 48,000 home sales that occurred within 5 miles of wind turbines in Rhode Island. *Id.* at 11. The third study, jointly prepared by the Lawrence Berkeley National Laboratory and the University of Connecticut, reviewed 122,000 home sales within 1 mile of operating turbines in Massachusetts. *Id.* Besides summarizing these three studies, Tuscola did not include any information or analysis regarding the possible impact of the proposed wind farm project on Tuscola County property values, specifically.

Tuscola attached a Sound Modeling Report as Appendix "D" to the SLUP application. Sound Modeling Rep, ECF No. 30, Ex. B. The report begins by quoting the Zoning Ordinance requirement (reproduced above) which provides that "[n]oise emissions from the operation of a WECS . . . shall not exceed forty-five (45) decibels on the DBA scale as measured at the nearest property line of a non-participating property owner or road." § 1522(C)(14). In the report, Tuscola asserts that "[n]o metric is specified for this ordinance, so we have assumed a 45 dBA 1-hour $L_{EQ}$." Sound Modeling Rep. at 4.

Later in the report, Tuscola expanded on its decision to construe the ordinance as involving 45 dBA 1-hour $L_{EQ}$. Tuscola explained: "Sound pressure levels are constantly changing. It is for this reason that it makes sense to describe sound levels over time." *Id.* at 5. The report then defined various ways of measuring sound levels: "$L_{min}$ and $L_{max}$ are simply the minimum and maximum sound level, respectively, monitored over a period of time." *Id.* But more sophisticated measures of sound levels over time exist:

> Ln is the sound level exceeded n percent of the time. . . . For example, the $L_{10}$ is the sound level that is exceeded 10 percent of the time, while $L_{90}$ is the sound level exceeded 90 percent of the time. The $L_{50}$ is the median and is exceeded half the time. The $L_{90}$ is often described as the "residual" level, describing a condition when most short-term contaminating sources are removed.

*Id.*

Finally, Tuscola defined its preferred metric: "One of the most common ways of describing noise levels is in terms of the continuous equivalent sound ($L_{EQ}$). The $L_{EQ}$ is the average of the sound *pressure* over an entire monitoring period." *Id.* (emphasis in original). Tuscola goes on:

> The monitoring period . . . can be for any amount of time. It could be one second ($L_{EQ\ 1\text{-sec}}$), one hour ($L_{EQ(1)}$), or 24 hours ($L_{EQ(24)}$). Because $L_{EQ}$ is a logarithmic function of the average pressure, loud and infrequent sounds have a greater effect on the resulting $L_{EQ}$ than quieter and more frequent sounds. . . . Because it tends to weight the higher sound levels and is representative of sound that takes place over time, the $L_{EQ}$ is the most commonly used descriptor in noise standards and regulations.

*Id.* at 6.

> Next, Tuscola discussed metrics for frequency weighting:

> [S]ound pressure levels are expressed in terms of decibels. Since the human ear is not sensitive to all frequencies equally, some frequencies, despite being the same decibel level, seem louder than others. For example, a 500 Hz tone at 80 dB sounds louder than a 63 Hz tone at 80 dB. For this reason, frequency weightings are applied to sound levels . . . . The most common weighting scale used in environmental noise analysis in the A-weight, which more accurately represents the sensitivity of the human ear at low to moderate sound energy. An A-weighted sound level is usually denoted with the unit dBA or dB(A).

*Id.*

Thus, the Zoning Ordinance specifies the metric for use in frequency weighting (dBA), but does not expressly identify the metric for measuring sound pressure levels. Applying its preferred metric of $L_{EQ}$ 1-hour, Tuscola found that "the highest modeled sound level at any non-participating property line, or road adjacent to a non-participating property line within the Township of Almer is 45 dBA and the highest sound level at any residence is 44 dBA." *Id.* at 9.

The SLUP application additionally proposed that the "electrical power collection system," which would transport the energy produced by the turbines, include aboveground power lines. SLUP App. at 13. The Zoning Ordinance requires all electrical connection systems and power

lines from wind turbines to be located below ground, but permits the Planning Commission to waive that requirement. *See* Zoning Ord., at § 1522(C)(15).

## C.

To assist in its consideration of the application, the Township retained the Spicer Group, Inc., an engineering consulting firm. On October 25, 2016, the Spicer Group sent Tuscola an email requesting clarification and/or additional information regarding several aspects of the application. Spicer Oct. 25 Email, ECF No. 30, Ex. C. Three of the Spicer Group's concerns are relevant. First, Spicer questioned several aspects of the sound emissions report, including how Tuscola chose the 1-hour $L_{EQ}$ as the proper metric. *Id.* at 2. The Spicer Group further asked when Tuscola would be submitting an economic impact study, indicating concern that "the property value information provided on pages 10 through 11 of the TW3 SUP Application is not local and not pertinent to Almer Township." *Id.* Finally, the Spicer Group indicated that Tuscola's proposal to place the power lines above the ground did not conform with the Zoning Ordinance requirement that all electrical connection systems and lines from a wind farm be placed underground. *Id.* at 3. The Spicer Group acknowledged that the Planning Commission has discretion to waive that requirement, but suggested that Tuscola had not yet sought that waiver. *Id.*

Tuscola responded to the Spicer Group's inquiries on October 31, 2016. Oct. 31, 2016, Resp, ECF No. 30, Ex. D. Tuscola defended its use of the 1-hour $L_{EQ}$ metric by asserting that international standards for measuring sound in the wind turbine context use that metric. *Id.* at 4. Tuscola further noted that the Akron, Ellington, and Columbia Townships use the 1-hour $L_{EQ}$ metric and that past wind power projects in the area were assessed under that metric. *Id.* Tuscola explained that it did not provide an economic study specific to Almer Township because the Township had not requested one. Finally, Tuscola defended its proposal to place the power lines

from the wind turbines above ground. Tuscola explained that construction, maintenance, and repair are all more difficult and costly for underground lines. *Id.* at 6. Similarly, underground power lines require more cables and have a shorter life expectancy. *Id.*

**D.**

**1.**

On November 8, 2016, the Spicer Group submitted a report to the Planning Commission analyzing Tuscola's SLUP application. Spicer Rep., ECF No. 30, EX. F. In the report, the Spicer Group concluded that Tuscola had complied with many, indeed most, of the Zoning Ordinance's requirements. But the Spicer Group did identify a number of outstanding issues. Among other recommendations, the Spicer Group suggested that the Planning Commission should require Tuscola to commission or identify an economic impact study for the proposed Almer Township project. *Id.* at 5. The Spicer Group also noted that Tuscola had not provided information confirming that the proposed turbines had a braking device which complied with the Zoning Ordinance.[1] The Spicer Group explained that Tuscola was seeking an exception to certain Zoning Ordinance requirements: first, instead of building an 8-foot fence around the turbines, Tuscola was requesting leave to keep the structures locked at all times[2]; and, second, Tuscola was seeking leave to build aboveground transmission lines. Finally, the Spicer Group indicated that Tuscola's noise emissions report left several questions unanswered, including whether the 45 dBA limit was measured to the closest road, or simply to the closest road adjacent to a *non-participating property*. *Id.* at 7.

---

[1] § 1522(C)(11) requires each wind turbine to be "equipped with a braking device capable of stopping the [turbine's] operation in high winds."

[2] *See* § 1522(C)(8).

On November 10, 2016, the Planning Commission held a public hearing to discuss the SLUP application. Nov. 10, 2016, Hearing Tr., ECF No. 30, Ex. I. At the hearing, a representative from Tuscola discussed the project. Among other things, the Tuscola representative explained why he believed that 45 dBA 1-hour $L_{EQ}$ was the appropriate metric to use in determining the sound emissions produced by the turbines. *See id.* at 29–35. First, the representative explained that the 1-hour $L_{EQ}$ metric was used by certain international standards and was the metric used by the manufacturer to model probable sound emissions. *Id.* at 31. The representative also explained that the 1-hour $L_{EQ}$ metric was more practical: $L_{EQ}$ is used in many noise emission standards, regulations, and guidelines (including neighboring townships).[3] More importantly, the 1-hour $L_{EQ}$ metric is not "susceptible to wind gusts or other extraneous non-wind turbine events," unlike the $L_{max}$ metric. *Id.* at 32.

For the rest of the hearing, members of the community expressed their opinions on the proposals. Most speakers communicated objections to various aspects of the application (if not the project as a whole), but some expressed support for the wind energy project. Two sound engineers testified at the hearing. The first engineer, Rick James, is an employee of e-Coustic Solutions and was hired by concerned citizens. *Id.* at 107. First, Mr. James opined that Tuscola's noise emissions report likely understated the dBA level at several property lines. *Id.* at 108–09. Second, Mr. James challenged Tuscola's assertion that the noise emissions provision in the Zoning Ordinance allowed for an averaged sound level measurement, as opposed to a maximum level: "[T]he words are very explicit, they say, 'Shall not exceed 45 dBA.' When you read law you can't read into it when the words aren't there. It doesn't say 45 dBA Leq, it does not say 45 dBA average, it says not exceed

---

[3] The Tuscola representative specifically mentioned one New Hampshire regulation which stated that the noise emissions "shall not exceed" 45 dBA and where that language was interpreted as involving the $L_{EQ}$ metric.

45 dBA." *Id.* at 109. Ms. Kerrie Standlee, the principle engineer for Acoustics by Design, also

testified.[4] *Id.* at 130. Ms. Standlee concurred with Mr. James's interpretation of the ordinance:

> [T]he limit is stated in there that the level shall not exceed 45 dBA. It doesn't give any descriptor, is it supposed to be the Lmax or – and as was mentioned, an L90 or an L10 at 50, an Leq, it doesn't specify. Mr. James is correct in that when something is not specified, you take the normal interpretation, which would be Lmax. I'm with – I'm on the City of Portland Noise Review Board and we have an Lmax standard. It's not specified as the Lmax it's just – like yours it says it shall not exceed this level. And that is an absolute level, not – not an equivalent energy level.

*Id.* at 131.

Ultimately, the Planning Commission concluded that additional information was necessary before

the SLUP application could be ruled upon. Accordingly, the public hearing was adjourned.

**2.**

The day after the public hearing, Tuscola sent the Planning Commission a response

addressing several of the concerns raised by the Spicer Group. Nov. 11, 2016, Prop. Conditions,

ECF No. 30, Ex. J. Tuscola offered to provide a copy of GE's safety manual and technical

documentation to confirm that the turbines were equipped with a braking device, but indicated that

the documents could be provided only if the Township entered into a "commercially reasonable

non-disclosure agreement." *Id.* at 4. Tuscola also committed to providing a "baseline noise

emission study" prior to site plan approval. *Id.*

Several days later, Tuscola sent another communication to the Planning Commission

further addressing several of the issues identified by the Spicer Group. Nov. 15, 2016, Resp., ECF

No. 30, Ex. K. The response included an economic impact report. *See* Economic Impact Rep.,

ECR No. 30, Ex. K. That economic impact report discussed the project's probable financial impact

on local jobs, tax revenue, and lease payments. The report did not specifically identify the impact

---

[4] Acoustics by Design was retained by the Township to assist in reviewing the application.

the project would have on local property values, but summarized the studies (previously mentioned in the original SLUP application) which found no evidence in other states that existing wind farms lowered nearby property values. Tuscola also addressed the Spicer Group's concern regarding security at the turbines. Rather than placing a fence around the turbines as contemplated by the ordinance, Tuscola proposed "an alternate means of access control at the turbines: a locked access door built into the turbine." Nov. 15, 2016, Rep. at 5. Tuscola reiterated its request for permission to construct aboveground power lines.

Finally, Tuscola turned to the noise emissions issue. First, Tuscola discussed whether the 45 dBA limit is measured to the nearest road, even if the property owners adjacent to the road are participating in the wind project:

> Where a non-participant is adjacent to a participant and the two are separated by a road, it is logical that the 45 dBA limit applies at the non-participating property line, which is also the road center. But where two participating properties are adjacent but separated by a road, it is also logical that the 45 dBA limitation does not apply. The purpose of this subsection is to protect non-participants from the potential effects of wind turbine sound at the property line. From a policy standpoint, it makes no sense to protect those using the road (typically in an automobile) from wind turbine sound.

*Id.* at 6.

> Next, Tuscola addressed the appropriate sound metric by which to measure the sound level:

> A specific sound level metric is not specified in this ordinance. The ordinance says that noise emissions from a WECS "shall not exceed" 45 dBA at a non-participating property line, but "shall not exceed" is not a metric; it simply means that, whatever metric is reasonably applied, that number shall not exceed 45 dBA. Therefore, an interpretation must be made on what is the most appropriate metric to apply to evaluate this ordinance.

*Id.*

Tuscola explained that its preferred metric, $L_{EQ}$, is the "sound metric commonly used in community sound surveys, guidelines, regulations (including those in neighboring communities), and standards, and is appropriate for use here." *Id.* at 7

In further support of its proposed metric, Tuscola explained that "[t]he standard for measuring the wind turbine sound power, IEC 61400-11, requires $L_{eq}$ sound level measurements" and thus "[an] $L_{eq}$ sound level limit allows for an appropriate and reasonable 'apples to apples' comparison.'" *Id.* (emphasis omitted). Tuscola further emphasized that most public health studies use $L_{EQ}$ to define their findings. *Id.* Perhaps most importantly, Tuscola explained that nearby Ellington and Columbia Townships use a 1-hour $L_{EQ}$ metric to regulate sound emissions and that the same metric governed "compliance evaluations for [previous wind farm projects] in neighboring townships, including Akron ($L_{eq}$ specified), Fairgrove (no metric specified in the ordinance), and Gilford (no metric specific in the ordinance)." *Id.* Tuscola additionally noted that the Huron County and Akron Township ordinances couple "shall not exceed" language with an $L_{EQ}$ metric. *Id.*

Finally, Tuscola articulated why it believed an $L_{EQ}$ metric was more suited for measuring the true impact of wind farm noise emissions:

> A $L_{eq}$ metric makes more sense here than a short-duration metric such as an $L_{max}$, which is susceptible to wind gusts and other extraneous events that result in elevated sound levels unrelated to the operation of the wind turbine. In addition, it is not reasonable to determine that a facility is out of compliance based on a 1-second reading above a particular limit. The intent of a sound ordinance is typically to allow for the continued use and enjoyment of the property and/or residence. For sounds that are of a short duration and dramatic, such as gun shots, mine blasts, or pile driving, an $L_{max}$ metric could make sense, and is analogous to a speed limit infraction where an instantaneous level is necessary to protect the safety of drivers on the roadway. But for sound sources that are continuous in nature and do not include dramatic spikes, such as a wind turbine, using $L_{eq}$ over a given time period is more appropriate. Even then, as noted above, the measurement will be primarily determined by any louder noises during the time period.

*Id.* at 8.

<div align="center">

**E.**

</div>

On November 17, 2016, the Almer Township Board approved a "Wind Energy Conversion Systems Moratorium Ordinance." Moratorium, ECF No. 30, Ex. M.[5] In the moratorium, the Board indicated that applications for "Wind Energy Conversion Systems may be proliferating" and so "[t]he Township Board requires sufficient time for enactment of amendments to its Zoning Ordinance to establish reasonable regulations pertaining to the establishment, placement, construction, enlargement, and/or erection of Wind Energy Conversion System." *Id.* at 2. Thus, the Board enacted a

> moratorium, on a temporary basis, on the establishment, placement, construction, enlargement, and/or erection of Wind Energy Conversion Systems within the Township and on the issuance of any and all permits, licenses or approvals for any property subject to the Township's Zoning Ordinance for the establishment or use of Wind Energy Conversion Systems. . . . [T]his Ordinance shall apply to any applications pending before any Township board or commission, including the Township Board, Planning Commission or Zoning Board of Appeals.

*Id.* at 3.

<div align="center">

**F.**

</div>

On December 6, 2016, Acoustics by Design, the sound engineering firm retained by the Township to aid in reviewing the SLUP application, submitted a memorandum to the Planning Commission addressing the Zoning Ordinance's 45 dBA limit. Acoustics by Design Memo, ECF No. 30, Ex. O. The memorandum, prepared by Kerrie Standlee, addressed the proper interpretation of the "shall not exceed" language:

> Ordinance 1522 states that the noise radiating from a wind energy facility cannot exceed a level of 45 dBA at the nearest property line of a non-participating property

---

[5] Although independent corroboration of this fact is not present in the record, Tuscola alleges that four new Board members were elected on November 8. According to Tuscola, each of these new Board members were part of an anti-wind citizen advocacy group. One of the newly elected Board members, Jim Tussey, was designated as the Board's Planning Commission representative. Defendants do not contest these assertions.

owner or road. It does not however say anything about a noise metric that is associated with the limit. Because noise can be quantified in several ways, the omission of that detail has resulted in some of the Commissioners asking if the limit was intended to be what is referred to as a "maximum" noise level limit or if it was intended to be a limit associated with some other noise metric such as a statistical noise level limit (for instance, the $L_{01}$, $L_{10}$, $L_{50}$, or $L_{90}$ noise level – defined as the level exceeded 1%, 10%, 50% and 90% of a specified time period) or an energy equivalent noise level (the Leq noise level – the noise level, which if present continuously, that would have the same acoustic energy as the time-varying sound level present during a specified time period).

*Id.* at 3.

Ultimately, Mr. Standlee opined that the ordinance established a maximum noise level limit:

Without having access to any information regarding the ordinance author's intentions relative to the wording used in the ordinance, I would conclude that the 45 dBA limit specified in the ordinance is addressing a "maximum" noise level limit and not a limit associated with some other noise descriptor. Model noise ordinances written over the past 50 years have shown that noise ordinances can be written with a maximum noise level limit or they can be written with some other noise metric limit. However, in each case where a metric other than the maximum noise level is included, the noise metric was specified in the ordinance. When a noise limit is specified in an ordinance without reference to any specific noise metric, it is generally understood by acousticians that the limit is intended to be a "maximum" noise level limit and not a limit for a noise descriptor other than the maximum noise level.

*Id.*

The memorandum further explained that, even if a $L_{EQ}$ metric were adopted, Tuscola's proposed

1-hour $L_{EQ}$ metric was unreasonable:

While I can agree that it might be reasonable to conclude that the 45 dBA noise limit in the wind energy facility noise ordinance could be considered an Leq noise metric limit and not an absolute maximum noise level limit, I cannot agree with the consultant that the limit could be a one-hour $L_{eq}$ noise level limit. . . . Given the relatively short amount of time required to quantify the turbine sound level, it would be more reasonable to consider the noise limit in the ordinance is [sic] related to an $L_{eq}$ metric associated with a time period that is much shorter than a one-hour time period.

*Id.*

**G.**

On December 7, 2016, the Planning Commission held a second public hearing. Dec. 7, 2016, Tr., ECF No. 30, Ex. Q. A Tuscola representative opened the hearing by addressing the concerns previously raised by the community and the Planning Commission. In large part, the Tuscola representative summarized the company's November 15, 2016, submission to the Planning Commission. A representative of the Spicer Group was also present. After Tuscola's presentation, members of the Planning Commission began asking questions of both the Tuscola representatives and the Spicer Group. One Planning Commission member, Jim Tussey, appeared to lead the discussion (the relevant aspects of which will be summarized here).

First, Mr. Tussey addressed the noise emission metric dispute, asking whether the $L_{max}$ metric is equivalent to the $L_{EQ}$ metric. *Id.* at 43. Tuscola's representative said it was not. *Id.* at 44. The Planning Commission then addressed the economic impact study. Chairman Braem was concerned about the lack of local studies:

> I appreciate the studies from other areas and looked at them, but in my opinion the ordinance has stated property values and I would say the assumption is Almer Township or at the least, you know, in possibly the townships where we already have turbines, and what were the property increases, whatever. . . . Could they supplement with an assessment of their opinions of the property-value impact a little closer to home?

*Id.* at 58–59.

In response, a Tuscola representative explained that any study of only Almer Township would be statistically suspect:

> A study specific to Almer Township I think would be too -- too minute and specific to really have, you know, statistically significant results, and so that's why we relied on those larger studies that covered a lot more areas over a much -- a much longer period of time. So we didn't find any more specific info specific to this area, but I can look in to see what more specific info can be provided to you.
>
> The closest that I found is Tuscola controller presentation [sic] to the county that he indicated since wind turbines came through Tuscola County property values in those particular areas have climbed and have climbed higher than the overall

increase in property values that has been occurring since 2009. . . . And I want to point out that the national level studies that cover multiple states, I used an analysis method that, yes, it included some houses that were farther away from turbines, and fewer houses that were near turbines, but the way that the model weighted it is the nearer the house to a turbine, the exponentially higher that data point was weighted.

*Id.* at 59–60.

Eventually, the discussion returned to the proper noise emission metric. First, the Spicer Group representative explained his understanding of the ordinance: "[The Acoustics by Design sound engineer is] saying without any qualifier in your ordinance he thinks that it would be -- that you would interpret it as an Lmax, meaning 45 aren't at the property line . . . . The sound produced by the turbine itself, a hard line at the property line that would not exceed 45 decibels." *Id.* at 65. Mr. Tussey then articulated his understanding of the ambiguity in the ordinance: "That seems very reasonable, but just for everyone here to hear that there's ambiguity in the specification, and isn't the ambiguity caused because the first part of it uses an abbreviation of dBA? It doesn't spell out the words decibels space A weighted, it just says dBA?" *Id.* at 66. After the Spicer Group representative agreed, Mr. Tussey continued:

And the second part it says not to exceed when it could have used the engineering term Lmax in replacement of the text not to exceed. So we kind of have a little bit of a mixture, on one part we use an engineering unit, metric as it's called, and on the other side we use a text form or a written form of the method Lmax. Now, couldn't we have written the whole part out in English and couldn't we have written the whole part out using metric?

*Id.*

The Spicer Group representative agreed that the standard could have been expressed in whole using either written language or mathematical and technical metrics. *Id.*

In response, Tuscola emphasized that the Acoustics by Design report indicated that the ordinance could be reasonably construed as creating an $L_{EQ}$ standard, and then explained why an $L_{max}$ metric was problematic:

The Lmax is a challenge two reasons [sic]. One, you would not be able to do an unattended program per se, there's just too much fluctuation in the maximum. And also, it's challenging when you're there. . . . So you'll get wind gust which is brief but it will cause your sound levels to vary, and that makes it a -- one of the challenges on trying to use an Lmax along with the other challenges regarding sound power, apples-to-apples comparison, all that other stuff I talked about. But in the field trying to take a measurement and you're seeing the sound levels change if you're looking at a sound level meter, you know, varying and that could be due to lots of things, not necessarily the wind turbine. So it's difficult to pinpoint that sound level to a particular event.

*Id.* at 71–72.

When asked whether the tester could simply disregard non-representative spikes in sound, Tuscola explained the difficulty in doing so:

I mean, looking at it I can say okay, I felt the wind gust, all right, I'm going to throw this period out, but it becomes – it's on the observer. All right. The observer threw out a lot of periods and then somebody could go back and say well, why did you throw out all these periods? Well, it was a wind gust, I'm trying just to get an Lmax, and you can't go back and turn things off and try to get an Lmax background per se because the wind speeds vary and it's hard to pinpoint exact one-second level to an event. It's not impossible at times, but that's one of the challenges where you're depending on the observer to make that call versus just collecting data and seeing what the numbers bear out over a 10-minute period in leq.

*Id.* at 72–73.

At this point, Mr. Tussey asked whether Tuscola's position was that the $L_{max}$ metric was never used. Tuscola admitted that it was used in some situations: "There are instances where Lmax could be appropriate to evaluate, and Kerry Stanley indicated that in his experience in Portland they used an Lmax, so it's not – I'm not going to say it's never used, but an leq has been determined in other instances to be a reasonable approach as well for a similar type worry." *Id* at 73.

Eventually, Planning Commission Chairman Braem acknowledged: "I guess our charge we've got to interpret what our ordinance says." *Id.* at 78. The Tuscola representative appeared to agree:

I think it's an interpretation of what's reasonable. Is it meant to be a one-second exceedence? And if you feel that then that's an Lmax. If you feel that it's reasonable for some other duration, what's the reasonable way to apply this? I think that's the determination you have to make. I'm just giving you . . . what I've seen in other jurisdictions in my experience, and that's the leq.

*Id.* at 81.

Members of the Planning Commission then deliberated over whether they needed more information from Tuscola regarding the sounds emissions or whether they were prepared to make a determination regarding the proper interpretation of the ordinance. Ultimately, Chairman Braem moved to table consideration of the SLUP application and request further information from Tuscola. *Id.* at 94. The Planning Commission discussed the outstanding issues, and then approved the motion to adjourn. The Township's attorney summarized the requested information as follows: "[Y]ou want to request information from NextEra on property values, noise, sound models based on Lmax and if there is the justification you just referenced regarding the cost estimate on the decommissioning of the individual towers." *Id.* at 105.

### H.

### 1.

On December 22, 2016, Tuscola provided the supplemental information which the Planning Commission had requested. Dec. 22, 2016, Supp. Info, ECF No. 30, Ex. T. Among other things, Tuscola provided a report addressing whether the proposed development would comply with the Zoning Ordinance, if interpreted as providing a 45 dBA $L_{max}$ limit. In the report, Tuscola again explained why the $L_{max}$ metric is a poor tool for measuring wind turbine emissions:

- It is not representative of long-term exposure to wind turbine sound. Rather, it is a short-term statistical anomaly that occurs 0.0000001% of a year (i.e. 1 second in a year).

- One cannot subtract background from $L_{max}$ measured levels since the $L_{max}$ is not an equivalent average sound level, but rather the result of a damping function applied to the measured sound levels.

- The $L_{max}$ is highly variable as a metric that results in poor repeatability among similarly conducted measurements.

- Manufacturers of wind turbines do not report $L_{max}$ sound power for their wind turbines – only $L_{eq}$.

- $L_{max}$ is the result of many complex temporal interactions that cannot be reliably modeled, include synchronization of blade passages, angle to the turbine rotor, wind direction, turbulence, wind shear, previous sound levels, and several other factors.

- The ISO 9613-2 model forecasts equivalent average sound levels, not instantaneous $L_{max}$.

Dec. 22, 2016, Noise Emissions Memo. at 2, ECF No. 30, Ex. T.

> Tuscola further explained:
>
> The report . . . makes it quite clear that using an Lmax metric would make development of commercial wind energy in Almer Township impossible. Indeed, using that metric, a single wind turbine could not be sited within 2,775 feet (over ½ mile) from a non-participating property line. As Epsilon and RSG conclude in their report, requiring an Lmax metric would preclude Tuscola Wind III from siting a single wind turbine in the Township.

Dec. 22, 2016, Supp. Info. at 1.

Tuscola further argued that the ordinance should not be interpreted as imposing an $L_{max}$ standard because the ordinance was ambiguous, the industry standard is $L_{EQ}$, and because that interpretation "would not allow for any commercial wind development, which would be exclusionary and thus unlawful." *Id.* at 2.

Next, Tuscola addressed the Planning Commission's request for an economic impact study which provided information regarding the project's likely impact on local property values. Tuscola explained:

We already provided the Planning Commission with multiple scientific studies showing that wind turbines do not have a measurable impact on nearby property values. Several of these studies are described in our application. . . . These scientific studies make it clear that the Tuscola III project will not substantially diminish and impair property values. The Township does not need an area-specific study to substantiate that conclusion. That being said, we have attached some additional information specific to Tuscola County further showing the positive economic impact of wind turbines on all property owners in the community.

The first attachment is Standard & Poor's 2016 Bond Rating Report for Tuscola County, along with an article explaining the report. Standard & Poor gave the county a AA-bond rating, crediting wind development for expanding the tax base: "Although counties across the state experienced broad-based valuation declines, Tuscola's tax base has expanded during the past several years, largely as a result of the development of wind turbines and infrastructure."

. . .

If the Township were to deny our SLUP application based on the alleged failure to provide an adequate property value study, that would be a violation of our legal rights. No other special land use in Almer Township requires a property value study. Even sexually oriented businesses, which can be sited as close as 300 feet from a residential district and 1000 feet from a church or school (much closer than a turbine can be sited to non-participating property line) are not required to submit a property value study as part of their permitting process.

*Id.* at 3–4.

## 2.

On December 29, 2016, the Spicer Group responded to Tuscola's supplemental memorandum. Spicer Group Dec. 29, 2016, Resp., ECF No. 30, Ex. U. First, the Spicer Group addressed Tuscola's submissions regarding the local property values:

We note that the zoning ordinance requires such studies to address "…the area affected by the WECS…" and shall include probable financial impact as to "…property values." The 12/22 submittal does not address property values in the area of Almer Township; the focus seems to be on personal property values (note, the term "property values" is broad and inclusive of real property and personal property; the term "personal property values" is more narrow and is specific to personal property.)

*Id.* at 2 (quoting § 1522(C)(3)).

Next, the Spicer Group addressed the noise emissions issue. The Spicer Group questioned the accuracy of the data Tuscola provided regarding probable sound emission levels under an $L_{max}$ metric, explaining that the data was drawn from a Massachusetts study that might be premised on disparate conditions. The Spicer Group also challenged Tuscola's claim that application of an $L_{max}$ standard would be illegally exclusionary: "This apparent claim of exclusionary zoning is without merit – the Almer Township zoning ordinance is not prohibiting the development of the Wind Energy Conversion System. The applicant could secure more leases with property-owners to ensure they have enough participating parcels." *Id.* at 4.

### 3.

On January 3, 2017, Tuscola's representative sent a letter to the Planning Commission addressing the Spicer Group's memorandum. Jan. 3, 2017, Letter, ECF No. 30, Ex. V. The letter first disputed the Spicer Group's contention that the property value data had been limited to information regarding personal property. Rather, the letter emphasized that the studies and reports provided had discussed the impact of wind turbines on real property values in a variety of contexts (albeit not in an Almer Township-specific context). *Id.* at 2–3. Second, the letter addressed a number of the Spicer Group's contentions regarding the sound emissions issue. In large part, the letter reiterated Tuscola's previous arguments regarding why the ordinance did not require application of the $L_{max}$ metric and why that interpretation was not warranted. The Tuscola representative also defended its $L_{max}$ model, explaining that the Spicer Group's concerns simply underscore the unhelpful nature of the $L_{max}$ metric in the wind turbine context:

> Our acousticians' report explains the basis for the Lmax modeling and their conservative assumptions. As our report points out, expected Lmax sound levels are not generally evaluated with respect to a sound limit for wind energy systems. This coupled with a lack of manufacturers' data and lack of scientific studies comparing pre and post-construction studies for an Lmax results in a higher degree of uncertainty regarding an Lmax evaluation as compared to an Leq. Therefore,

more conservatism is included in our acousticians' analysis. Spicer's questions further illustrate why it makes no sense to imply an Lmax metric in the ordinance in the first instance.

*Id.* at 4.

# I.

# 1.

On January 4, 2017, the Planning Commission held its third and final public hearing on the SLUP application. Jan. 4, 2017, Hearing Tr., ECF No. 30, Ex. X. At the hearing, Tuscola summarized the documents it had submitted since the last hearing. As before, the discussion centered on the noise emissions issue. Planning Commission member Tussey asked whether the ordinance's standard (45 dBA), was an "incomplete metric." *Id.* at 18. The Tuscola representative asserted that "[i]t's ambiguous as to the metric used to measure 45 dB(A)." *Id.* Mr. Tussey continued: "And you're saying it's ambiguous because there's not more to 45 dB(A). There should be a dB(A) something, such as Leq one hour, and then it would be a complete metric. That's what you've said, that 45 dB(A) Leq one hour is a complete metric." *Id.* at 20. The Tuscola representative clarified the company's position: "45 dB(A) is not ambiguous. The ordinance is silent as to a metric, which means it requires interpretation." *Id.* Mr. Tussey then articulated his interpretation of the ordinance:

> [I]n the scientific community metric is -- are the units applied to whatever value. For example, miles per hour is a metric. . . . You can use additional qualifiers on the metric. For example, Ryan, I could say that you drove a 45 miles an hour to get here and everybody would understand that. And there would be no argument that miles per hour is the metric.
>
> . . .
>
> So the ordinance does state dB(A) and dB(A) is a valid metric. No one questions if dB(A) is, in fact, a dB(A). There are options to provide additional metric qualifiers to that metric, but dB(A) is the metric. And you have confused, I believe at a scientific level, the use of dB(A) with some qualifier with dB(A); and, hence,

you're trying to make a presentation that somehow our ordinance is incomplete. And I do not find it incomplete. I find the ordinance quite complete. It says 45. Just as if the speed was said to be 45, not to exceed, any average person can understand that. . . . [T]he purpose of this body is not to rewrite an ordinance.

*Id.* at 20–22.

Tuscola responded: "[T]he ordinance is silent as to the way you measure 45 dB(A)." *Id.* at 23. Rather, the metric raises that question: "[W]hen you have a 45, you have to – is it instantaneous, is it - - is it a maximum, is it an Leq, is it L90? That metric is part of it, and it's not in this ordinance." *Id.*

After addressing other disputed issues, including whether Tuscola was required to provide Almer Township-specific property value studies, Planning Commission member Daniels moved to recommend denial of the SLUP application. *Id.* at 44. The Commissioners then discussed their opinions on the application. Chairman Braem asked Commissioner Tussey whether the ordinance should be interpreted as imposing an $L_{max}$ standard since neighboring townships had interpreted similar language as creating an $L_{EQ}$ standard. Tussey replied: "I'm not struggling with Lmax because 45dB(A) is a valid metric. . . . And the fact that the ordinance says not to exceed – and I believe even from a legal standpoint we're always to interpret the simplest definition in English. And that our job here isn't to interpret what they meant; it is to enforce what is written." *Id.* at 45–46.

Commissioner Daniels also articulated his rationale for recommending denial of the SLUP application. He asserted that "[t]he ordinance does not allow for the averaging varying levels of sound. We, as a Planning Commission, are not here to rewrite the ordinance, but to enforce the ordinance as written. And it mandates a maximum sound level of 45 decibels." *Id.* at 47. Commissioner Daniels also opined that Tuscola had not procured adequate insurance coverage for the turbines and had not made sufficient efforts to minimize shadow flicker for Almer Township

residents. Chairman Braem then briefly explained that he was satisfied with the insurance coverage, the economic impact study, and efforts to reduce shadow flicker.

Ultimately, the Planning Commission voted 3 to 1 to recommend denial of the SLUP application (two members did not vote because of a conflict of interest). *Id.* at 51–52.

**2.**

On January 17, 2017, the Almer Township Board held a public meeting to review the Planning Commission's recommendation regarding the SLUP application. Jan. 17, 2017, Tr., ECF No. 30, Ex. DD. After opening the floor to public comments (including comments by a Tuscola representative), the Board discussed the Planning Commission's recommendation to deny the SLUP application. Every Board member to discuss the recommendation on the record was supportive of the Planning Commission's rationale for denial. And most Board members appeared to focus on the noise emissions issue. For example, Board Member Rosenstangel stated that the Planning Commission's recommendation was "very well put together. And my concern was the 45 decibels shall not exceed. And I think that's what we should stick with is it shall not exceed the 45 decibels." *Id.* at 19. Board Member Graff made a similar statement:

> I also agree with the shall not exceed. I look at this not any different than a speed limit. If you're going 55 miles an hour, 55 miles an hour is the speed limit that you're supposed to have, you can't average it out. You can't drive from Saginaw to Cass City and go 75 miles an hour, but you have to slow down for all the little towns in between. When the police officer stops you outside of Cass City, you don't say, well, you have to relook at it because, if you average it out, I was only going 55 miles an hour.

*Id.* at 20–21.

Likewise, Board Member Tussey (who is the Board's Planning Commission representative) reiterated his reasons for opposing the SLUP application. Ultimately, the Almer Township Board voted 5 to 1 to deny the SLUP application. *Id.* at 33–35.

The Board simultaneously issued a Resolution articulating its rationale for denying the SLUP application. Res. Deny. SLUP, ECF No. 30, Ex. FF. In the Resolution, the Board identified five areas in which the SLUP application did not comply with the Zoning Ordinance. First, the Board faulted Tuscola for not providing an adequate economic impact study. Despite being asked to "provide a property values analysis that was localized to Almer Township," Tuscola "provided property value analyses based on other states, as well as some information concerning *personal* property values in Michigan, but still provided no *real property* value analyses using Michigan data." *Id.* at 6–7 (emphasis in original).

Second, the Board found that the SLUP application did not comply with the Zoning Ordinance's limit on noise emissions. The Board explained that the ordinance's "limitation on noise emissions . . . is clear and unambiguous and requires no further qualifying metric or analysis." *Id.* at 7. In response to Tuscola's argument that an $L_{EQ}$ standard should be utilized, the Board found that "using an $L_{eq}$ standard is inconsistent with the plain and unambiguous language of the Zoning Ordinance, which clearly provides that noise from a WECS 'shall not exceed forty-five (45) decibels.'" *Id.* at 8. The Board further referenced the opinion of "acoustician Kerrie G. Standlee," who advised the Planning Commission that the language of the Zoning Ordinance would ordinarily be interpreted by acousticians as establishing a maximum noise level limit.[6]

Third, the Board explained that Tuscola had not complied with the ordinance's requirement that an eight foot security fence be placed around the turbines. The Board acknowledged that Tuscola sought a variance from that requirement from the Planning Commission, but noted that the variance was not approved. And the Board concurred with that decision: "The Township Board

---

[6] The Board further indicated that even if an $L_{EQ}$ metric were adopted, the 1-hour $L_{EQ}$ suggested by Tuscola was not warranted. Rather, a ten-minute interval would be more appropriate. Tuscola had previously indicated that, if a ten-minute interval were applied, the proposed locations of the wind turbines would have to be revisited. Thus, even if the Board adopted the $L_{EQ}$ metric, Tuscola would still have been required to amend its proposal.

also does not approve this alternative, as the Township Board finds that the proposed alternative of having no fence will not adequately protect the public health, safety, and welfare." *Id.* at 10.

Fourth, the Board faulted Tuscola for not providing the turbine safety manual and thus confirming that the turbines are equipped with an adequate braking device: "The Applicant has withheld documentation . . . that would identify the braking device's capability, citing the Applicant's nondisclosure agreement with GE." *Id.* at 10–11.

Fifth, the Board found that Tuscola had not complied with the ordinance's requirement that the electrical lines stemming from the turbines be placed underground. Again, the Board concurred with the Planning Commission's refusal to waive that requirement: "The Township Board . . . does not grant the requested waiver because it finds that the proposed underground lines would be detrimental to the aesthetics of the Township and will not protect the public health, safety, and welfare." *Id.* at 11.

Finally, the Board noted that it had previously approved a moratorium on wind energy projects in the Township and thus was precluded from approving the SLUP application even if it had complied with the Zoning Ordinance.

**3.**

On January 9, 2017, several days after the Planning Commission recommended denial of the SLUP application, Tuscola requested an interpretation of the Zoning Ordinance's 45 dBA limit by the Zoning Board of Appeals. ZBA Interp. App., ECF No. 30, EX. Z. In the application, Tuscola asked the ZBA to provide expedited review: "Under Section 2401 of the Ordinance, the Township Board must make a decision on Tuscola Wind III's application within 30 days of the Planning Commission's recommendation; in other words, by February 3, 2017. Given that the ZBA's

interpretation will be binding on the Township Board, we respectfully request that the ZBA render its interpretation before that date." *Id.* at 4.

The ZBA did not give expedited consideration to Tuscola's request. When the Almer Township Board denied the SLUP application, the ZBA appeal had not yet been resolved. Tuscola subsequently withdrew its request for an interpretation of the Zoning Ordinance's provision regarding noise emissions. March 10, 2017, Email, ECF No. 35, Ex. 4.

## II.

Review of Count One of the complaint (a claim of appeal from the Township Board decision denying the SLUP application) is governed by article 6, § 28 of the Michigan Constitution. Pursuant to that section, the review "shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record." Mich. Const. Art. 6, § 28.

Thus, the Court must determine both whether the decision was "authorized by law" and supported by "substantial evidence." A decision is "authorized by law" if "allowed, permitted, or empowered by law." *Northwestern. Nat. Cas. Co. v. Ins. Com'r*, 586 N.W.2d 563, 566 (1998) (citing Black's Law Dictionary (5th ed.)). In other words, "[t]he decision must be affirmed unless it is in violation of statute, in excess of the statutory authority or jurisdiction of the agency, made upon unlawful procedures resulting in material prejudice, or is arbitrary and capricious." *Brandon Sch. Dist. v. Michigan Educ. Special Servs. Ass'n*, 477 N.W.2d 138, 141 (1991). Thus, the "authorized by law" analysis "focuses on the agency's power and authority to act rather than on the objective correctness of its decision." *Northwestern*, 586 N.W.2d at 566.

"Substantial evidence" is "evidence that a reasonable person would accept as sufficient to support a conclusion. While this requires more than a scintilla of evidence, it may be substantially less than a preponderance." *Dowerk v. Charter Twp. of Oxford*, 233 Mich. App. 62, 72 (1998). The Michigan Supreme Court has discussed the nature of the "substantial evidence" standard:

> What the drafters of the Constitution intended was a thorough judicial review of administrative decision, a review which considers the whole record-that is, both sides of the record-not just those portions of the record supporting the findings of the administrative agency. Although such a review does not attain the status of De novo review, it necessarily entails a degree of qualitative and quantitative evaluation of evidence considered by an agency. Such review must be undertaken with considerable sensitivity in order that the courts accord due deference to administrative expertise and not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views.

*Michigan Employment Relations Comm'n v. Detroit Symphony Orchestra, Inc.*, 393 Mich. 116, 124 (1974).

"Strict deference must be given to an administrative agency's findings of fact," and the "agency's decision must be upheld if it is supported by such evidence as a reasonable mind would accept as adequate to support the decision." *THM, Ltd. v. Comm'r of Ins.*, 176 Mich. App. 772, 776 (1989).

Pursuant to the Michigan Zoning Enabling Act, "[a] request for approval of a land use or activity shall be approved if the request is in compliance with the standards stated in the zoning ordinance, the conditions imposed under the zoning ordinance, other applicable ordinances, and state and federal statutes." M.C.L. 125.3504.

## III.

Tuscola argues each of the Board's purported reasons for denying the SLUP application were contrary to Michigan law and not supported by substantial evidence. Tuscola further argues that the Board did not have the authority to enact a moratorium on wind energy projects in the Township. For its part, the Township argues that Tuscola's appeal is not ripe because the company

did not appeal from a final decision of the Township. Next, the Township argues that each of the Board's expressed reasons for denying the SLUP application were reasonable and permitted by law. And, finally, the Township argues that the temporary moratorium on wind energy project permits was valid.

## A.

The Township argues that this case is not ripe for appeal. Practically speaking, this argument is about finality. The Township argues that because Tuscola did not appeal to the Zoning Board of Appeals, a final decision on the SLUP application had not been rendered. If appeal to the ZBA is a precondition to judicial review in this context, then this Court lacks jurisdiction to adjudicate this matter. Accordingly, this threshold issue will be resolved first.

Tuscola contends that the Court has jurisdiction to hear this appeal via article 6, section 28 of the Michigan Constitution. That provision states that "[a]ll *final* decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law." *Id.* (emphasis added).

The Almer Township Zoning Ordinance establishes a Zoning Board of Appeals ("ZBA"). Almer Twp. Zoning Ord., Art. 23. The Almer Township's ZBA was created under the authority and direction provided by the Michigan Zoning Enabling Act, M.C. L. 125.3101 *et seq.* Pursuant to M.C.L. 125.3604(1),

> An appeal to the zoning board of appeals may be taken by a person aggrieved or by an officer, department, board, or bureau of this state or the local unit of government. In addition, a variance in the zoning ordinance may be applied for and granted under section 4 of the uniform condemnation procedures act, 1980 PA 87, MCL 213.54, and as provided under this act. The zoning board of appeals shall state the grounds of any determination made by the board.

*Id.*[7]

More importantly, M.C.L. 125.3605 specifies that "[t]he decision of the zoning board of appeals shall be final. A party aggrieved by the decision may appeal to the circuit court for the county in which the property is located as provided under section 606." Thus, the Michigan Zoning Enabling Act specifies that, generally, a decision regarding a zoning ordinance is final for purposes of article 6, section 28 of the Michigan Constitution only after the zoning board of appeals has decided the issue.[8]

Tuscola argues that "a ripeness challenge is appropriate only when a party challenges the constitutionality of an ordinance, not when the party claims an appeal from a township's administrative decision." Pl. Reply Br. at 1, ECF No. 37. In support of that contention, Tuscola cites *Arthur Land Co., LLC v. Otsego Cty.*, 645 N.W.2d 50 (Mich. Ct. App. 2002). There, the Michigan Court of Appeals explained that

> although there is no requirement that a plaintiff exhaust administrative remedies before bringing a taking or substantive due process claim, *Electro-Tech, Inc. v. H.F. Campbell Co.*, 433 Mich. 57, 79, 445 N.W.2d 61 (1989), a judicial challenge to the constitutionality of a zoning ordinance, as applied to a particular parcel of land, is not ripe for judicial review until the plaintiff has obtained a final, nonjudicial determination regarding the permitted use of the land (e.g., denial of a special-use permit or variance). *See Paragon*, *supra* at 576, 550 N.W.2d 772.

*Id.* at 58 n. 20.

---

[7] M.C.L. 125.3604 permits local governments to give zoning boards of appeals the authority to grant use variances, but does not require them to do so. *Id.* at 125.3604(11).

[8] Note that M.C.L. 125.3607(1) permits "[a]ny party aggrieved by any order, determination, or decision of any officer, agency, board, commission, zoning board of appeals, or legislative body of any local unit of government made under section 208" to appeal directly to the circuit court. The cited section, M.C.L. 125.3208, involves scenarios where "the the use of a dwelling, building, or structure or of the land is lawful at the time of enactment of a zoning ordinance or an amendment to a zoning ordinance." In that situation, the local legislative body may provide provisions in the amended zoning ordinance addressing the treatment of prior existing but now nonconforming uses. That situation is not present here, but the exception to the general requirement of appeal to the ZBA prior to judicial review proves the rule.

But *Arthur Land* does stand for the proposition that Tuscola suggests. The footnote which Tuscola cites simply distinguishes between the kinds of constitutional claims which require finality. Here, Tuscola is challenging the Township Board's interpretation and application of the Zoning Ordinance, not advancing any kind of taking or substantive due process claim. And, further, the very section of the Michigan Constitution which Tuscola relies upon for jurisdiction predicates its applicability on the existence of a *final* decision. If the SLUP application has not been denied in a final, nonjudicial determination, this Court has no jurisdiction under article 6, section 28 of the Michigan Constitution.

The determinative question, then, is whether the Almer Township Board's denial of the SLUP application was a final decision. Tuscola argues that it was: "A township board's decision on a SLUP application is a final decision that does not need to be appealed to the ZBA unless required by the zoning ordinance." Pl. Reply Br. at 2. In support of that contention, Tuscola relies upon *Carleton Sportsman's Club v. Exeter Twp.*, 550 N.W.2d 867, 869 (Mich. Ct. App. 1996). In *Carleton*, the Michigan Court of Appeals held that "where a township zoning ordinance does not provide for review of a request for a special land-use permit by a zoning board of appeals, the township board's decision is final and subject to appellate review by the circuit court pursuant to Const. 1963, Art. 6, § 28." *Id.*

The *Carleton* decision was premised on the language in the Michigan's Township Rural Zoning Act, M.C.L. 125.271 *et seq.*, which specified that "an appeal of a township board's decisions regarding special land-use and planned unit development decisions, 'may be taken to the board of appeals only if provided for in the zoning ordinance.'" *Carleton*, 550 N.W.2d at 869 (quoting M.C.L. 125.290). The Michigan's Township Rural Zoning Act has since been replaced by the Michigan Zoning Enabling Act, but the operative language remains. *See* M.C.L. 125.3603

("For special land use and planned unit development decisions, an appeal may be taken to the zoning board of appeals only if provided for in the zoning ordinance.").

Here, the Almer Township Zoning Ordinance does not expressly grant the ZBA jurisdiction to consider Township Board denials of SLUP applications. The Zoning Ordinance gives the ZBA general jurisdiction to "hear and decide appeals where it is alleged there is error of law in any order, requirement, decision or determination made by the Zoning Administrative or *administrative bod*y in the enforcement of this Ordinance." Almer Twp. Zoning Ord., Art. 23, § 2302 (emphasis added). A township board is typically a legislative body, but can act in an administrative capacity in certain situations. The Michigan Court of Appeals has explained that "approval of special use permits" is typically an administrative function, but "where the city council is given the discretion to review the issue de novo and accept or reject the recommendations of the planning commission in the ordinance, the council's power is, instead, legislative." *Swiecicki v. City of Dearborn*, No. 262892, 2006 WL 2613593, at *7 (Mich. Ct. App. Sept. 12, 2006) (citing *Sun Communities v. Leroy Twp*, 617 NW2d 42 (Mich. Mc. App. 2000) and *Hesse Realty, Inc v. Ann Arbor*, 61 Mich. App 319, 323–324 (1975)). The Almer Township Zoning Ordinance grants the Township Board discretion to conduct a de novo review of the Planning Commission's recommendations regarding SLUP applications, and thus Tuscola is appealing from a legislative decision.

The Zoning Ordinance does not on its face permit appeals to the ZBA from legislative decisions by the Township Board. And such a dynamic would be counterintuitive because the members of the ZBA are appointed by the Township Board and are tasked with interpreting the provisions of the Zoning Ordinance as enacted *by* the Township Board. Because the Zoning Ordinance does not specifically provide for appeal of a SLUP application to the ZBA, the

Township Board's decision is a final and appealable order per *Carleton*. The denial of the SLUP application is ripe for review.

<div align="center">**B.**</div>

Proceeding to the merits of the appeal,[9] Tuscola has not demonstrated that the denial of the SLUP application was contrary to law or not support by substantial evidence, as those standards have been articulated by Michigan courts. The Township Board based its denial of the application on five perceived deficiencies in the SLUP application. Accordingly, the Township Board's decision will be disturbed only if none of the five bases for denial were consistent with the law and supported by substantial evidence.

The record reflects that the Planning Commission, Township Board, and Tuscola devoted substantial attention to the proper interpretation of the Zoning Ordinance's section providing that noise emissions from wind turbines "shall not exceed" 45 dBA. Zoning Ordinance, § 1522(C)(14). Because so much of the record is devoted to that dispute, this issue will be addressed first. For several reasons, Tuscola's noncompliance with the noise emission limit was a permissible basis for the Township Board to premise its denial of the SLUP application.

<div align="center">**1.**</div>

The initial issue which must be confronted is the extent to which this Court should defer to the Township Board's interpretation of its own Zoning Ordinance. Tuscola contends that the Court must conduct a de novo review of the proper interpretation of the ordinance. Appellant Br. at 20.

_____

[9] Tuscola also challenges the validity of the moratorium which the Township Board enacted in November of 2016. Although the moratorium on wind energy projects was enacted after Tuscola's SLUP application was submitted (but before it was rejected), the Planning Commission and Township Board proceeded to consider the SLUP application on its merits. At most, the Township Board relied upon the moratorium as an alternative (and secondary) basis for denying the SLUP application. Because the Board's denial of the application was supported by substantial evidence and was not contrary to law, the legitimacy of the moratorium need not be resolved. And, importantly, because the moratorium has now ended, any opinion on the Township Board's prospective authority to enact another moratorium would constitute an advisory opinion. *See* Appellee Resp. Br. at 24–25.

In fact, Tuscola expressly identifies its "ZBA request for interpretation" as further articulating the reasons why the Township Board's interpretation was incorrect. *Id.* at 20 n. 14. Tuscola thus assumes that this Court's analysis should be conducted independently and without reference to the Township Board's. But such an approach is inconsistent with Michigan law.

Michigan Courts have repeatedly confirmed that courts should defer to municipal interpretations of zoning ordinances. *See Macenas v. Vill. of Michiana*, 446 N.W.2d 102, 110 (Mich. 1989) ("[T]he import of our case law is that a reviewing court is to give deference to a municipality's interpretation of its own ordinance."); *Id.* ("[I]n cases of ambiguity in a municipal zoning ordinance, where a construction has been applied over an extended period by the officer or agency charged with its administration, that construction should be accorded great weight in determining the meaning of the ordinance."); *Davis v. Bd. of Ed. for Sch. Dist. of River Rouge*, 280 N.W.2d 453, 454 (Mich. 1979) ("We acknowledge that the construction placed upon a statute by the agency legislatively chosen to administer it is entitled to great weight."); *Paye v. City of Grosse Pointe*, 271 N.W. 826, 828 (Mich. 1937) (holding that a municipality's construction of an ordinance is not binding on a court, but that the municipality's construction is "always entitled to the most respectful consideration" and should not "be overruled without cogent reasons") (internal citations omitted). *But see Kalinoff v. Columbus Twp.*, 542 N.W.2d 276, 277 (Mich. Ct. App. 1995) (holding that deference to the zoning board's interpretation would not be given because "when the language used in an ordinance is clear and unambiguous, we may not engage in judicial interpretation, and the ordinance must be enforced as written").

The Michigan Court of Appeals' decision in *Sinelli v. Birmingham Bd. of Zoning Appeals* is particularly instructive. 408 N.W.2d 412, 414 (Mich. Ct. App. 1987). In *Sinelli*, the dispute centered on the meaning of the term "public property" in the zoning ordinance. The plaintiffs in

*Sinelli* wished to prevent a new restaurant from leasing a portion of land zoned as "public property" from the City of Birmingham to use for parking. The City argued that its interpretation of "public property,"—specifically, that it included off-street private parking—was "a reasonable exercise of [its] discretion." *Id.* The circuit court granted summary disposition for the defendants. On appeal, the Michigan Court of Appeals emphasized that "Birmingham has consistently interpreted § 5.15 as allowing the city to lease for parking purposes property zoned 'public property.'" *Id.* In conjunction with a discussion regarding the proper construction of the ordinance, the court concluded that the City of Birmingham had arrived at "a reasonable interpretation of the provision." *Id.* And, the court explained, that was sufficient to justify judgment for the defendants: "This Court will not sit in judgment on matters wholly within the reasonable discretion of local zoning boards whose decisions are regarded as final and binding unless caprice, abuse of discretion, or arbitrary action is provable." *Id.* at 415.

Here, the final decision on the SLUP application was rendered by the Township Board, the legislative body which enacted the Zoning Ordinance in the first place. And, as explained above, the SLUP application denial constitutes a legislative decision under Michigan law. In this context, the importance of deferring to the Township Board's interpretation of the statute is even greater. When a statute or ordinance is ambiguous, the ultimate authority on the meaning of the language would naturally be the legislative body which drafted and enacted it. *See Macenas*, 446 N.W.2d at 111 ("When there is no readily apparent meaning to a statutory phrase, we ordinarily turn to an attempt to determine the intent of the legislative body that enacted the statute or ordinance."). Typically, courts must interpret ambiguous statutory language without the benefit of an interpretation by the relevant legislative body. But where, as here, the legislative body has provided

an interpretation of the ordinance it passed, it would be counterintuitive to provide that interpretation no deference.

Thus, this Court does not sit in de novo review of the Zoning Ordinance provision regarding noise emission levels (assuming that the ordinance is ambiguous). Rather, the question is whether the Township Board's interpretation of the ordinance was "reasonable." *Sinelli*, 408 N.W.2d at 414. *See also Macenas*, 446 N.W.2d at 112. If the Board's decision was the result of "caprice, abuse of discretion, or arbitrary action," then it was not reasonable. *Sinelli*, 408 N.W.2d at 415. But unless there are "cogent reasons" to conclude that the Board's consideration was not reasonable, the Board's interpretation must be affirmed. *Macenas*, 446 N.W.2d at 112.

### 2.

Tuscola argues that the "Board's interpretation of Section 1522(C)(14) as unambiguously providing for an $L_{max}$ sound metric was not reasonable." Appellant's Br. at 20. But, for several reasons, that argument falls short. First, the plain language of § 1522(C)(14) is best interpreted as imposing an $L_{max}$ standard. Second, even if the provision is considered to be ambiguous, there is at best equivocal support for construing the provision as imposing an $L_{EQ}$ standard. Rather, even if the provision could reasonably be interpreted as imposing an $L_{EQ}$ standard, Tuscola has simply demonstrated that several reasonable interpretations of the provision exist. In the absence of cogent reasons to find the Township Board's interpretation unreasonable, its interpretation must be affirmed.

### i.

As indicated above, Michigan courts have held that "when the language used in an ordinance is clear and unambiguous, we may not engage in judicial interpretation, and the

ordinance must be enforced as written." *Kalinoff*, 542 N.W.2d at 277. Thus, if the provision in question is not ambiguous, no further analysis is necessary.

> The provision in question reads, in full:

> Noise emissions from the operations of a [Wind Energy Conversion System] shall not exceed forty-five (45) decibels on the DBA scale as measured at the nearest property line of a non-participating property owner or road. A baseline noise emission study of the proposed site and impact upon all areas within one mile of the proposed WECS location must be done (at the applicant's cost) prior to any placement of a WECS and submitted to the Township. The applicant must also provide estimated noise levels to property lines at the time of a Special Use application.

§ 1522(C)(14).

In the written resolution which the Township Board issued in conjunction with its denial of the SLUP application, the Board reasoned that the "limitation on noise emissions . . . is clear and unambiguous and requires no further qualifying metric or analysis." Res. Deny SLUP at 7. Tuscola argues that the provision is facially ambiguous because "'[s]hall not exceed' is not a metric—it simply means that whatever metric is applied, that number shall not exceed 45 dBA." Appellant Br. at 21.

The fundamental dispute between the parties is whether the provision includes a metric for measuring 45 dBA or whether the "shall not exceed" language constitutes a definable means of measuring sound emissions. Several facts are uncontested. First, all parties agree that sound can be measured in different ways. *Compare* Appellants Br. at 21 *with* Appellate Resp. Br. at 15. *See also* Sound Modeling Rep. at 5–6. Possible sound emission metrics include $L_{max}$, $L_{min}$, $L_n$, or $L_{EQ}$. As detailed above, each of these metrics constitutes a distinct way of measuring sound levels over time. The dispute between the parties centers on whether the ordinance calls for use of $L_{max}$ or $L_{EQ}$. As already explained, $L_{max}$ is "the . . . maximum sound level . . . monitored over a period of time." *Id.* at 5. $L_{EQ}$, on the other hand, is the "continuous equivalent sound." *Id.* In other words, $L_{EQ}$ is the

"logarithmic function of the average [sound] pressure" over an "entire monitoring period." *Id.* at 6, 5.

Both $L_{max}$ and $L_{EQ}$ are meaningful only in the context of a given period of time. $L_{max}$ can be measured only in reference to a time period: the maximum sound level reached during the specified period of measurement. Similarly, a complete $L_{EQ}$ metric requires a notation of the length of the monitoring period that is being averaged. *See id.* at 6 ("The monitoring period . . . can be for any amount of time. It could be one second ($L_{EQ\ 1\text{-}sec}$), one hour ($L_{EQ(1)}$), or 24 hours ($L_{EQ(24)}$).")." Tuscola concedes (even advances) this point: "[The Township] argues that $L_{eq}$ makes no sense because that metric requires a monitoring period and no monitoring period is specified in the Ordinance. . . . But as the Township itself points out, $L_{max}$ requires a monitoring period as well." Appellant Reply Br. at 4–5 (internal citations omitted).

Section 1522(C)(14) does not include any language expressly identifying the length of the monitoring period. As such, the ordinance is ambiguous on that point. But that point of ambiguity is not the basis on which the Township Board denied the SLUP application. As Tuscola implicitly recognizes in the argument just quoted, the ambiguity created by the absence of a specified monitoring period exists regardless of whether the ordinance is interpreted as imposing an $L_{max}$ or $L_{EQ}$ standard. In other words, if the Township Board construed the ordinance as imposing a ten minute monitoring period, the question of whether the 45 dBA limit had been violated during that ten minute period would still be dependent on the means of measuring sound emissions. If $L_{max}$ were used, then a single instance of sound emissions exceeding 45 dBA during the ten minutes would put the turbine in violation of the ordinance. If $L_{EQ}$ were used, then the ordinance would be violated only if the continuous equivalent sound pressure over the ten minutes exceeded 45 dBA.

Tuscola appears to concede that, if the $L_{max}$ metric were adopted, then its turbines would be in noncompliance with the ordinance regardless of the length of the monitoring period. *See* Dec. 22, 2016, Supp. Info at 1 ("The report . . . makes it quite clear that using an Lmax metric would make development of commercial wind energy in Almer Township impossible."). The ambiguity regarding the monitoring period is thus irrelevant. Rather, the determinative issue (and the one on which the Township Board rested its conclusion) is whether the ordinance imposes an $L_{max}$ or $L_{EQ}$ standard. And the Township Board's conclusion that § 1522(C)(14)'s language unambiguously provides for an $L_{max}$ standard was eminently reasonable.

$L_{max}$ involves maximum sound level achieved over a period of time; $L_{EQ}$ involves a logarithmic averaging of the sound pressure over a period of time. By definition, then, if sound emissions over one hour total 45 dBA $L_{EQ}$, then the sounds emissions during that period almost certainly included moments when the instantaneous sound level exceeded 45 dBA. In other words, the "continuous equivalent sound" measured during a specified period inevitably constitutes a midpoint between the absolute high and low values measured during that period. *See* Sound Modeling Rep. at 5.

The "[s]hall not exceed" language in § 1522(C)(14) is facially indistinguishable from a $L_{max}$ standard. If a wind turbines emitted 46 dBA of noise, then a common-sense reading of the provision (relying only on the language of the provision and no extraneous information) would conclude that the turbine had violated § 1522(C)(14). No language in § 1522(C)(14) would support a conclusion that one *instantaneous* emission of 46 dBA of noise is not violative of the statute as long as the turbine's *average* emission does not exceed 45 dBA.

When § 1522(C)(14) is compared to other ordinances which the Township could have mirrored, the best interpretation of the section becomes clear. Take, for example, the language in

Huron County's noise ordinance: "The audible sound from a Wind Energy Facility at a Noise Sensitive Facility may not exceed the Equivalent A-Weighted Continuous Sound Level (L$_{eq}$) limits set forth in Table 1[.]" Appellee Resp. Br. at 17 (emphasis omitted). The Huron County Ordinance thus defines the L$_{EQ}$ standard by using the words "equivalent" and "continuous." Conversely, the Almer Township Zoning Ordinance is devoid of any terms that correspond to an L$_{EQ}$ standard: there is no mention of equivalent, continuous, or average sound levels. Rather, § 1522(C)(14) simply specifies that the emissions "[s]hall not exceed" 45 dBA. That language is coterminous with the definition of L$_{max}$ (as defined by Tuscola itself): If the wind turbine emits a sound that exceeds 45 dBA, the ordinance has been violated. The ordinance does not, on its face, provide for an averaging of noise emissions. Thus, the best interpretation of § 1522(C)(14) is that it unambiguously provides for a L$_{max}$ standard. Any alternative interpretion would require inclusion of additional language or terms; the L$_{max}$ standard alone is consistent with the words, and only the words, of § 1522(C)(14).[10]

**ii.**

Even if the Court were to conclude that § 1522(C)(14) is ambiguous regarding how to measure sound emissions (and not just ambiguous regarding the length of time over which to measure them), Tuscola's argument still falls short. Tuscola argues, correctly, that when an ordinance is ambiguous, courts must apply principles of statutory interpretation. "Unless defined in the statute, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used." *Alcona Cty. v. Wolverine Envtl.*

---

[10] The maxim "expressio unius est exclusio alterius" is applicable here: "the expression of one thing is the exclusion of another, [the maxim] means that the express mention of one thing in a statute implies the exclusion of other similar things." *Alcona Cty. v. Wolverine Envtl. Prod., Inc.*, 590 N.W.2d 586, 590 (Mich. Ct. App. 1998). The ordinance specifies that a certain noise level shall not be exceeded, but does not provide that noise emissions shall be averaged. Because language referring to average noise emissions or continuous equivalent pressure has been omitted, the implication is that such language has been purposely excluded.

*Prod., Inc.*, 590 N.W.2d 586, 590 (Mich. Ct. App. 1998). "Statutory language should be construed reasonably and the purpose of the statute should be kept in mind." *Id.* (internal citations omitted). Tuscola emphasizes that some courts (though no Michigan courts) have relied upon industry standards when interpreting statutory language. Appellant Br. at 23. *See also Prill v. Hampton*, 453 N.W.2d 909, 912 (Ct. App. 1990). But even considering all the factors and evidence which Tuscola relies on, the company has at best shown that the ordinance could reasonably be interpreted in several different ways.

To begin with, Tuscola's assertion that the SLUP application denial was premised solely on a finding that the language of § 1522(C)(14) is unambiguous, as opposed to an interpretation of what the language should be construed as requiring, is inaccurate. Admittedly, the written resolution which the Township Board provided in conjunction with its on-the-record denial of the application does assert that "using an L$_{eq}$ standard is inconsistent with the plain and unambiguous language of the Zoning Ordinance." Res. Deny SLUP at 7. But Tuscola's implicit assertion that the Township Board refused to consider the Ordinance's context and any extraneous information that might inform their interpretation of the language is manifestly inconsistent with the record. During the hearing, several members of the Board discussed the language of § 1522(C)(14) and explained why they believed that it was incompatible with an L$_{EQ}$ standard. *See* Jan. 17, 2017m Tr. at 19, 21.[11] Likewise, in the written resolution the Township Board expressly relied on, and quoted, the testimony provided by acoustician Kerrie Standlee. Because of its significance, that testimony will be quoted, again, here:

> Without having access to any information regarding the ordinance author's intentions relative to the wording used in the ordinance, I would conclude that the 45 dBA limit specified in the ordinance is addressing a "maximum" noise level

---

[11] And, of course, the Township Board's decision was informed by the Planning Commissions' recommendation, which was made only after hearing extensive testimony by Tuscola representatives and sound engineers regarding the best interpretation of the provision.

limit and not a limit associated with some other noise descriptor. Model noise ordinances written over the past 50 years have shown that noise ordinances can be written with a maximum noise level limit or they can be written with some other noise metric limit. However, in each case where a metric other than the maximum noise level is included, the noise metric was specified in the ordinance. When a noise limit is specified in an ordinance without reference to any specific noise metric, it is generally understood by acousticians that the limit is intended to be a "maximum" noise level limit and not a limit for a noise descriptor other than the maximum noise level.

Acoustics by Design Memo. at 3.

Tuscola challenges Standlee's opinion by asserting that his interpretation of the ordinance is simply "an improper legal conclusion." Appellant Br. at 21. But Standlee clearly premises his opinion on both his own experience in the industry and what he understands industry standards to be. Tuscola argues elsewhere in its brief that those factors are relevant for properly interpreting the ordinance, and so it cannot reasonably discount Standlee's opinion for discussing industry standards. Tuscola appears to fault Standlee for relying upon generalizations, but Standlee provided very specific examples in his testimony before the Planning Commission. At the November 10, 2016, public hearing, Standlee testified "when something is not specified, you take the normal interpretation, which would be Lmax." Nov. 10, 2016, Hearing Tr. at 130. Standlee continued:

> [T]he limit is stated in there that the level shall not exceed 45 dBA. It doesn't give any descriptor, is it supposed to be the Lmax or – and as was mentioned, an L90 or an L10 at 50, an Leq, it doesn't specify. Mr. James is correct in that when something is not specified, you take the normal interpretation, which would be Lmax. I'm with – I'm on the City of Portland Noise Review Board and we have an Lmax standard. It's not specified as the Lmax it's just – like yours it says it shall not exceed this level. And that is an absolute level, not – not an equivalent energy level.

*Id.* at 131.

Thus, Standlee provided an expert opinion regarding how most acousticians would read the Almer Township Zoning Ordinance language, opined that the ordinance imposes an $L_{max}$

standard, and provided an example of another city ordinance (which uses the same language) that has been interpreted to mean $L_{max}$. Tuscola attempts to undermine Standlee's testimony by pointing to "the numerous concrete examples provided by TWIII's experts of sound provisions in wind ordinances, both in the Thumb and elsewhere, that either marry 'shall not exceed' language with an $L_{eq}$ metric . . . or recognized $L_{eq}$ as the appropriate metric in the absence of a specific metric." Appellant Br. at 22. Tuscola has not provided the language of the ordinances it refers to, and so it is difficult to ascertain the extent to which the statutory language is analogous.

The Township does provide the statutory language in the Akron Township and Huron County ordinances (which Tuscola cites for the proposition that "shall not exceed" language can be combined with an $L_{EQ}$ standard), but both those ordinances expressly define the metric as $L_{EQ}$. It goes without saying that if the Zoning Ordinance specifically identified the metric, then no more interpretation would be needed. But the Almer Township Zoning Ordinance does not clearly identify the metric (or, at least, Tuscola repeatedly argues that the ordinance is ambiguous). The Akron Township and Huron County zoning ordinances utilize noise emission standards with materially different language and thus are of minimal relevance.

Ultimately, however, Tuscola's argument obfuscates the underlying analysis which must be conducted. The question is not whether the Zoning Ordinance could reasonably be interpreted as creating an $L_{EQ}$ standard (though, as discussed above, the plain language of § 1522(C)(14) suggests that it could not). Rather, the question is whether the Township Board's interpretation was so unreasonable as to justify departure from the deference normally given to a municipality's interpretation of its own ordinance. As such, the language of other noise emission ordinances provides context, but is far from determinative.

Tuscola (and its experts) repeatedly, and perhaps accurately, assert that the industry standard is to measure wind turbine sound emissions using $L_{EQ}$, not $L_{max}$. But Tuscola's noise emission expert admitted that use of an $L_{max}$ standard is not patently unreasonable:

> [Planning Commission Member Tussy:] Are you saying that dBA max is never used?
>
> [Tuscola Expert Lampeter:] There are instances where Lmax could be appropriate to evaluate, and Kerry Stanley indicated that in his experience in Portland they used an Lmax, so it's not – I'm not going to say that it's never used, but an leq has been determined in other instances to be a reasonable approach *as well* for a similar type worry."

Dec. 7, 2016, Hearing Tr. at 72 (emphasis added).

Later in the hearing, Mr. Lampeter again addressed the reasonableness of alternative interpretations. A Planning Commission member stated: "I guess our charge we've got to interpret what our ordinance says." *Id.* at 77. Mr. Lampeter agreed:

> I think the decision is what's reasonable and also what are we bound to in the ordinance, and I would say that jurisdictions have interpreted it as an leq, and I'd also say that's reasonable based on other standards . . . . I think it's an interpretation of what's reasonable. Is it meant to be a one-second exceedence? And if you feel that then that's an Lmax. If you feel that it's reasonable for some other duration, what's the reasonable way to apply this? I think that's the determination you have to make. I'm just giving you what I've seen in other jurisdictions in my experience, and that's the leq.

*Id.* at 78–80.

Thus, Tuscola's own expert appeared to concede that both $L_{EQ}$ and $L_{max}$ could reasonably be used. Mr. Lempeter's arguments (and the arguments Tuscola now makes) are fundamentally premised on the assertion that an $L_{EQ}$ standard is a better choice. And that may be true. If this Court were making an independent determination of what metric is best suited for measuring wind turbine noise emissions, it might well select the $L_{EQ}$ standard. But, for purposes of this review, it is not relevant whether $L_{EQ}$ is the best way to measure noise emissions or whether the ordinance

could reasonably be construed as imposing that standard. Rather, Tuscola must demonstrate that the Township Board's adoption of the $L_{max}$ standard *was not reasonable*.

Tuscola's expert agreed that the $L_{max}$ standard is a valid metric which is used in certain municipal noise ordinances and that the Almer Township Zoning Ordinance could be interpreted in several reasonable ways. The Township's noise expert opined that most sound experts would read the Almer Township Zoning Ordinance as imposing an $L_{max}$ standard, confirmed that the $L_{max}$ standard is a valid metric, and identified a specific municipality where the noise emissions ordinance utilizes an $L_{max}$ standard. Against this factual background (and considering the plain language of the statute), the Township Board's conclusion that § 1522(C)(14) imposes an $L_{max}$ standard was reasonable. That conclusion was consistent with principles of statutory interpretation and supported by substantial evidence in the record. Reasonable minds might have arrived at a different conclusion. But the fact that several reasonable alternatives exist does not constitute a "cogent reason" to disregard a municipality's interpretation of its own ordinance. *See Macenas*, 446 N.W.2d at 112. To the contrary, that fact provides a persuasive rationale for deferring to the Municipality's decision. *See Alcona Cty.*, 590 N.W.2d at 596 n. 8 ("Although an agency's construction of a statute cannot be used to overcome a statute's plain meaning, . . . given that the position adopted by the MDEQ is plausible and is consistent with the language of the statute, it is entitled to reasonable deference."). The Court will do so here.

### iii.

Tuscola's final argument regarding § 1522(C)(14) is that the Township Board's interpretation would result in exclusionary zoning, which is prohibited by Michigan law. Specifically, Tuscola argues that "[u]sing an $L_{max}$ metric would make development of commercial wind energy in the Township impossible because a single wind turbine could not be sited within

at least a half-mile of a nonparticipating line." Appellant Br. at 24–25. This conclusory argument has no merit. Under Michigan, "a zoning ordinance may not totally exclude a land use where (1) there is a demonstrated need for that land use in the township or surrounding area, (2) the use is appropriate for the location, and (3) the use is lawful." *Eveline Twp. v. H & D Trucking Co.*, 448 N.W.2d 727, 730 (Mich. Ct. App. 1989). *See also* M.C.L. 125.3207. Even assuming that the Township Board's interpretation of the ordinance completely excludes wind energy development in the Township, Tuscola cannot prevail.[12]

Tuscola has made no attempt to show that there is a "demonstrated public need" for wind turbines in Almer Township, and the Court cannot comprehend why such a need would exist. "Presumably any entrepreneur seeking to use land for a particular purpose does so because of its perception that a demand exists for that use. To equate such a self-serving demand analysis with the 'demonstrated need' required by the statute would render that language mere surplusage or nugatory, in contravention of usual principles of construction." *Outdoor Sys., Inc. v. City of Clawson*, 686 N.W.2d 815, 819 (Mich. Ct. App. 2004). Further, "the public need must be more than mere convenience to the residents of the community." *DF Land Dev., LLC v. Charter Twp. of Ann Arbor*, No. 291362, 2010 WL 2757000, at *6 (Mich. Ct. App. July 13, 2010).

Wind turbines produce energy, which is, of course, needed by the Almer Township community. But Tuscola cannot reasonably argue that the Township will have inadequate access to energy absent the wind energy project. The Michigan Court of Appeals has explained that, to

---

[12] And that assumption is questionable. Tuscola asserts that application of an $L_{max}$ standard would prevent the company from siting a turbine within 2,775 feet from a nonparticipating property line. *See* Dec. 22, 2016, Supp. Info. at 1. Thus, Tuscola would be forced to reach agreements with a significantly larger number of property owners in order to build the turbines as currently planned. But it seems plausible that Tuscola might be able to enter into more land use contracts with property owners and/or site a fewer number of turbines in Almer Township. Both of those alternatives would undoubtedly impact the profitability of the project, but Tuscola has not demonstrated that it is entitled to deferential or economically favorable conditions. Perhaps application of an $L_{max}$ standard creates such an economic hardship that it constitutes de facto exclusionary zoning. But Tuscola's conclusory briefing on this point falls far short of showing that to be true.

show demonstrated public need, the plaintiff must do more than show that "residents of the township would *benefit* from" the excluded use. *Id.* (emphasis in original). Tuscola has not carried that burden here.

## C.

The Township Board reasonably interpreted its Zoning Ordinance and, under that reasonable interpretation, Tuscola was undisputedly in noncompliance with the Zoning Ordinance. Because at least one of the bases on which the Board premised its denial was lawful, the remaining four bases need not be examined. The Township Board's denial will be affirmed.

## IV.

Accordingly, it is **ORDERED** that Defendant Almer Township Board's denial of Plaintiff Tuscola Wind III, LLC's, SLUP application is **AFFIRMED.**


Dated: November 3, 2017                                s/Thomas L. Ludington
                                                       THOMAS L. LUDINGTON
                                                       United States District Judge


<div style="border:1px solid">

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 3, 2017.

s/Kelly Winslow
KELLY WINSLOW, Case Manager

</div>