UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TUSCOLA WIND III, LLC,

                     Plaintiff,                         Case No. 17-cv-10497

v                                         Honorable Thomas L. Ludington

ALMER CHARTER TOWNSHIP, et al,

                     Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, DENYING DEFENDANTS' MOTION IN LIMINE AS MOOT, DISMISSING COUNTS TWO, THREE, AND FOUR, AND DISMISSING COUNT FIVE IN PART

On February 15, 2017, Plaintiff Tuscola Wind III, LLC, ("Tuscola") filed a complaint naming the Almer Charter Township and that Township's Board of Trustees as Defendants. ECF No. 1. Count One of the Complaint is the "Claim of Appeal." Compl. at ¶¶ 100–124. Tuscola Wind's claims arise out of Defendants' denial of a Special Land Use Permit ("SLUP") that would have permitted Tuscola Wind to construct the "Tuscola III Wind Energy Center" in Tuscola County, Michigan. Compl. at 6. Oral argument on the claim of appeal was held on October 5, 2017. Approximately one month later, the Court issued an opinion and order affirming the Almer Charter Township's denial of the SLUP application. ECF No. 39.

On February 26, 2018, Defendants filed a motion for summary judgment on the remaining counts of the complaint. ECF No. 55. Specifically, Defendants argue that no violation of procedural due process rights occurred, that no equal protection violation occurred, that Tuscola's Zoning Enabling Act claim is meritless, and that Tuscola's Opening Meetings Act claim should be dismissed. On April 24, 2018, Defendants filed a motion in limine seeking to exclude evidence regarding noise emissions from Caro Motorsports from admission at trial. ECF No. 64. For the

following reasons, the motion for summary judgment will be granted in part, the motion in limine will be denied as moot, and Counts Two, Three, and Four will be dismissed. Count Five will be dismissed in part.

**I.**

In the Court's November 3, 2017, opinion and order, the Court summarized, at length, the procedural and factual history of Tuscola's SLUP application and the Township's consideration of the same. Because those facts bear considerable relevance to the presently disputed issues, large portions of that factual summary will be reproduced here.[1]

Tuscola Wind III, LLC, is a Delaware limited liability company, which is indirectly wholly owned by NextEra Energy Resources, LLC. Tuscola Wind SLUP App. at 1, ECF No. 30, Ex. B. Tuscola is attempting to build the "Tuscola III Wind Energy Center" in Tuscola County, Michigan. *Id.* The project, if completed, would include 55 wind turbines in Fairgrove, Almer, and Ellington Townships, and would produce enough energy to supply 50,000 homes with wind energy. *Id.* In its SLUP application, Tuscola explained that "[t]he Project facilities are to occupy 15.2 acres of land, and will be serviced by 6.6 miles of access roads, occupying 12.9 acres of land." *Id.* at 2. Prior to submitting the SLUP application, Tuscola had entered into agreements with 87 landowners (representing 192 parcels of land) for the use of their property for the project. *Id.* Those individuals are described as "participating landowners." *Id.* Thus, at the time the SLUP application was submitted, Tuscola had already identified the ideal number of and locations for wind turbines in Almer Township, categorized parcels of land as necessary or unneeded, and secured access to the parcels it believed were required for the proposed project. The present dispute centers on Tuscola's

---

[1] For the full summary, *see* Nov. 3, 2017, Op. & Order at 1–26. Rather than citing to both the November 3, 2017, opinion and the underlying sources, only the underlying sources will be cited here.

attempt to secure SLUP approval for the 19 wind turbines that Tuscola wishes to build in Almer Township.

Tuscola has provided an example of one of the "Short Form Option Agreements" which it entered into with local landowners in Tuscola Township. *See* Opt. Agreement, ECF No. 62, Ex. 1A. In the Agreement,[2] the landowner grants Tuscola "an option to purchase" certain "easements in connection with the development, construction, and operation of a wind energy project in Tuscola County, Michigan." *Id.* at 1. "The period during which the Option may be exercised shall begin on the date when both Owner and Operator have executed the Agreement, and shall continue for a period of thirty-six (36) months after such date." *Id.* If and when Tuscola exercises the option (known as the "Commencement Date"), Tuscola's rights to the easements vest and continue until thirty-five "years after the date when the wind power project has achieved the status of a commercially operable wind-powered electrical generation and transmission facility." *Id.* at 2. The easements automatically renew for a subsequent thirty year term unless Tuscola opts out. *Id.*

**A.**

The Almer Township Zoning Ordinance characterizes wind energy systems as special land uses. As such, Tuscola was required to seek a Special Land Use Permit ("SLUP") from the Township for the project. *See* Almer Zoning Ord. Art. 24, ECF No. 30, Ex. A. Pursuant to Section 2401 of the Zoning Ordinance, the first step in receiving approval for a wind energy system is to submit a SLUP application to the Township's Planning Commission. *Id.* at § 2401. Upon receipt of the application, the Planning Commission is required to hold a public hearing within 45 days. *Id.* After the public hearing, the Planning Commission recommends either granting or denying the application to the Township Board and must state its reasons for the decision. *Id.* Once the Planning

---

[2] Tuscola provides a Short Form summary rather than the full agreement.

Commission issues its recommendation, the Township Board will render a decision on the SLUP application. *Id.* Section 1522 of the Almer Township Zoning Ordinance provides special requirements for SLUP applications involving a wind energy system. *Id.* at § 1522. Among other things, the applicant must provide an escrow account to cover the Township's costs and expenses associated with the SLUP zoning review and approval process. *Id.* at § 1522(C)(1). Likewise, the applicant must fund and submit environmental and economic impact studies (if requested by the Township). *Id.* at § 1522(C)(2)–(3). The application must include a site plan which specifies the design characteristics of the turbines, safety features, security measures, and a lighting plan. *Id.* at § 1522(C)(4).

Similarly, "[a]ll efforts shall be made not to affect any resident with any strobe effect or shadow flicker." *Id.* at § 1522(C)(20). The Zoning Ordinance provides the general admonishment that "[t]he wind energy conversion system shall not be unreasonably injurious to the public health and safety or to the health and safety of occupants of nearby properties." *Id.* at § 1522(C)(7). The zoning ordinance likewise directs that "[n]oise emissions from the operations of a [Wind Energy Conversion System] shall not exceed forty-five (45) decibels on the DBA scale as measured at the nearest property line of a non-participating property owner or road." *Id.* at § 1522(C)(14).

**B.**

**1.**

On September 23, 2016, Tuscola submitted its SLUP application to the Almer Township Planning Commission. To assist in its consideration of the application, the Township retained the Spicer Group, Inc., an engineering consulting firm. On October 25, 2016, the Spicer Group sent Tuscola an email requesting clarification and/or additional information regarding several aspects of the application. Spicer Oct. 25 Email, ECF No. 30, Ex. C. The Spicer Group challenged several

aspects of the sound emissions report submitted by Tuscola, asked when Tuscola would be submitting an economic impact study, and indicated that Tuscola's proposal to place the power lines above the ground did not conform with the Zoning Ordinance requirement that all electrical connection systems and lines from a wind farm be placed underground. *Id.* In its response, Tuscola defended its SLUP application, asserting that it had complied with all requirements requested by the Township.

**2.**

On November 8, 2016, the Spicer Group submitted a report to the Planning Commission analyzing Tuscola's SLUP application. Spicer Rep., ECF No. 30, Ex. F. In the report, the Spicer Group concluded that Tuscola had complied with many, indeed most, of the Zoning Ordinance's requirements. But the Spicer Group did identify a number of outstanding issues. Among other recommendations, the Spicer Group suggested that the Planning Commission should require Tuscola to commission or identify an economic impact study for the proposed Almer Township project. *Id.* at 5. The Spicer Group also noted that Tuscola had not provided information confirming that the proposed turbines had a braking device which complied with the Zoning Ordinance. The Spicer Group explained that Tuscola was seeking an exception to certain Zoning Ordinance requirements: first, instead of building an 8-foot fence around the turbines, Tuscola was requesting leave to keep the structures locked at all times; and, second, Tuscola was seeking leave to build aboveground transmission lines. Finally, the Spicer Group indicated that Tuscola's noise emissions report left several questions unanswered, including whether the 45 dBA limit was measured to the closest road, or simply to the closest road adjacent to a non-participating property. *Id.* at 7.

On November 10, 2016, the Planning Commission held a public hearing to discuss the SLUP application. Nov. 10, 2016, Hearing Tr., ECF No. 30, Ex. I. At the hearing, a representative from Tuscola discussed the project. Among other things, the Tuscola representative explained why he believed that 45 dBA 1-hour $L_{EQ}$ was the appropriate metric to use in determining the sound emissions produced by the turbines. *See id.* at 29–35. First, the representative explained that the 1-hour $L_{EQ}$ metric is used by certain international standards and is the metric used by the manufacturer to model probable sound emissions. *Id.* at 31. The representative also explained that the 1-hour $L_{EQ}$ metric is more practical because $L_{EQ}$ is used in many noise emission standards, regulations, and guidelines (including neighboring townships). More importantly, the 1-hour $L_{EQ}$ metric is not "susceptible to wind gusts or other extraneous non-wind turbine events," unlike the $L_{max}$ metric. *Id.* at 32.

For the rest of the hearing, members of the community expressed their opinions on the proposals. Most speakers communicated objections to various aspects of the application (if not the project as a whole), but some expressed support for the wind energy project. Two sound engineers testified at the hearing. The first engineer, Rick James, is an employee of e-Coustic Solutions and was hired by concerned citizens. *Id.* at 107. First, Mr. James opined that Tuscola's noise emissions report likely understated the dBA level at several property lines. *Id.* at 108–09. Second, Mr. James challenged Tuscola's assertion that the noise emissions provision in the Zoning Ordinance allowed for an averaged sound level measurement, as opposed to a maximum level: "[T]he words are very explicit, they say, 'Shall not exceed 45 dBA.' When you read law you can't read into it when the words aren't there. It doesn't say 45 dBA Leq, it does not say 45 dBA average, it says not exceed 45 dBA." *Id.* at 109. Ms. Kerrie Standlee, the principal engineer for Acoustics by Design, also testified. *Id.* at 130. Ms. Standlee concurred with Mr. James's interpretation of the ordinance:

[T]he limit is stated in there that the level shall not exceed 45 dBA. It doesn't give any descriptor, is it supposed to be the Lmax or – and as was mentioned, an L90 or an L10 at 50, an Leq, it doesn't specify. Mr. James is correct in that when something is not specified, you take the normal interpretation, which would be Lmax. I'm with – I'm on the City of Portland Noise Review Board and we have an Lmax standard. It's not specified as the Lmax it's just – like yours it says it shall not exceed this level. And that is an absolute level, not – not an equivalent energy level.

*Id.* at 131.

Ultimately, the Planning Commission concluded that additional information was necessary before the SLUP application could be ruled upon. Accordingly, the public hearing was adjourned. After the hearing, Tuscola sent a number of responses to the Planning Commission which addressed the issues and concerns identified by the Spicer Group and the Planning Commission.

**3.**

On November 8, 2016, four new Board members were elected. According to Tuscola, all four new members were "part of the anti-wind Ellington-Almer Concerned Citizens Group." Pl. App. Br. at 6, ECF No. 31. The new Board members took office on November 20, 2016, and held a special meeting on November 22, 2016.

At that special meeting, the Almer Township Board voted to retain Mr. Homier of Foster Swift. Compl. at 23. Tuscola has attached an invoice submitted by Mr. Homier in December 2016 which indicates that he had been discussing Tuscola's SLUP application with one of the new Board members days before they were elected, and that he had drafted moratorium on wind energy SLUP applications on November 18, 2016, after the four new Board members were elected, but before they took office. Foster Swift Invoice, ECF No. 62, Ex. 18.

The new Board approved the "Wind Energy Conversion Systems Moratorium Ordinance" at the November 22, 2016, special meeting. Moratorium, ECF No. 30, Ex. M. *See also* Nov. 22, 2016, Meeting Minutes, ECF No. 30, Ex. N. In the moratorium, the Board indicated that

applications for "Wind Energy Conversion Systems may be proliferating" and so "[t]he Township Board requires sufficient time for enactment of amendments to its Zoning Ordinance to establish reasonable regulations pertaining to the establishment, placement, construction, enlargement, and/or erection of Wind Energy Conversion System." Moratorium at 2. Thus, the Board enacted a

> moratorium, on a temporary basis, on the establishment, placement, construction, enlargement, and/or erection of Wind Energy Conversion Systems within the Township and on the issuance of any and all permits, licenses or approvals for any property subject to the Township's Zoning Ordinance for the establishment or use of Wind Energy Conversion Systems. . . . [T]his Ordinance shall apply to any applications pending before any Township board or commission, including the Township Board, Planning Commission or Zoning Board of Appeals.

*Id.* at 3.

**4.**

On December 7, 2016, the Planning Commission held a second public hearing. Dec. 7, 2016, Tr., ECF No. 30, Ex. Q. A Tuscola representative opened the hearing by addressing the concerns previously raised by the community and the Planning Commission. In large part, the Tuscola representative summarized the company's November 15, 2016, submission to the Planning Commission. A representative of the Spicer Group was also present. After Tuscola's presentation, members of the Planning Commission began asking questions of both the Tuscola representatives and the Spicer Group.

The questioning at the second public hearing primarily focused on the ongoing dispute over the proper metric by which to measure wind turbine noise emissions and the adequacy of the economic impact studies provided by Tuscola. Several commissioners were concerned that the economic impact information provided by Tuscola did not include local studies. In response, Tuscola indicated that any study of only Almer Township would be statistically suspect. *Id.* at 14. There was also discussion regarding whether the zoning ordinance directed that $L_{max}$ or $L_{EQ}$ be used

to measure noise emissions and which of those metrics was best suited to measuring wind turbine noise emissions.

Eventually, the hearing drew to a close. Members of the Planning Commission deliberated over whether they needed more information from Tuscola regarding the sounds emissions or whether they were prepared to make a determination regarding the proper interpretation of the ordinance. Ultimately, Chairman Braem moved to table consideration of the SLUP application and request further information from Tuscola. *Id.* at 94. The Planning Commission discussed the outstanding issues, and then approved the motion to adjourn. The Township's attorney summarized the requested information as follows: "[Y]ou want to request information from NextEra on property values, noise, sound models based on Lmax and if there is the justification you just referenced regarding the cost estimate on the decommissioning of the individual towers." *Id.* at 105.

**5.**

After the second public hearing, Tuscola, the Spicer Group, and the Planning Commission engaged in correspondence regarding the issues identified at the hearing. Again, discussion focused primarily on the sound emissions metric issue and the economic impact issue.

On January 4, 2017, the Planning Commission held its third and final public hearing on the SLUP application. Jan. 4, 2017, Hearing Tr., ECF No. 30, Ex. X. At the hearing, Tuscola summarized the documents it had submitted since the last hearing. As before, the discussion centered on the noise emissions issue. Tuscola argued that the zoning ordinance was ambiguous as the metric for measuring sound emissions and asserted that the $L_{EQ}$ metric should be adopted. Members of the Planning Commission disagreed, arguing that the zoning ordinance's "shall not exceed" language necessarily meant that it imposed an $L_{max}$ standard.

After addressing other disputed issues, including whether Tuscola was required to provide Almer Township-specific property value studies, Planning Commission member Daniels moved to recommend denial of the SLUP application. *Id.* at 44. The Commissioners then discussed their opinions on the application. Chairman Braem asked Commissioner Tussey whether the ordinance should be interpreted as imposing an $L_{max}$ standard since neighboring townships had interpreted similar language as creating an $L_{EQ}$ standard. Tussey replied: "I'm not struggling with Lmax because 45dB(A) is a valid metric. . . . And the fact that the ordinance says not to exceed – and I believe even from a legal standpoint we're always to interpret the simplest definition in English. And that our job here isn't to interpret what they meant; it is to enforce what is written." *Id.* at 45–46. Commissioner Daniels also articulated his rationale for recommending denial of the SLUP application. He asserted that "[t]he ordinance does not allow for the averaging varying levels of sound. We, as a Planning Commission, are not here to rewrite the ordinance, but to enforce the ordinance as written. And it mandates a maximum sound level of 45 decibels." *Id.* at 47. Commissioner Daniels also opined that Tuscola had not procured adequate insurance coverage for the turbines and had not made sufficient efforts to minimize shadow flicker for Almer Township residents. Chairman Braem then briefly explained that he was satisfied with the insurance coverage, the economic impact study, and efforts to reduce shadow flicker.

Ultimately, the Planning Commission voted 3 to 1 to recommend denial of the SLUP application (two members did not vote because of a conflict of interest). *Id.* at 51–52.

### C.

### 1.

On January 17, 2017, the Almer Township Board held a public meeting to review the Planning Commission's recommendation regarding the SLUP application. Jan. 17, 2017, Tr., ECF

No. 30, Ex. DD. After opening the floor to public comments (including comments by a Tuscola representative), the Board discussed the Planning Commission's recommendation to deny the SLUP application. Every Board member to discuss the recommendation on the record was supportive of the Planning Commission's rationale for denial. And most Board members appeared to focus on the noise emissions issue. For example, Board Member Rosenstangel stated that the Planning Commission's recommendation was "very well put together. And my concern was the 45 decibels shall not exceed. And I think that's what we should stick with is it shall not exceed the 45 decibels." *Id.* at 19. Board Member Graff made a similar statement:

> I also agree with the shall not exceed. I look at this not any different than a speed limit. If you're going 55 miles an hour, 55 miles an hour is the speed limit that you're supposed to have, you can't average it out. You can't drive from Saginaw to Cass City and go 75 miles an hour, but you have to slow down for all the little towns in between. When the police officer stops you outside of Cass City, you don't say, well, you have to relook at it because, if you average it out, I was only going 55 miles an hour.

*Id.* at 20–21.

Likewise, Board Member Tussey (who is the Board's Planning Commission representative) reiterated his reasons for opposing the SLUP application. Ultimately, the Almer Township Board voted 5 to 1 to deny the SLUP application. *Id.* at 33–35.

The Board simultaneously issued a Resolution articulating its rationale for denying the SLUP application. Res. Deny. SLUP, ECF No. 30, Ex. FF. In the Resolution, the Board identified five areas in which the SLUP application did not comply with the Zoning Ordinance. First, the Board faulted Tuscola for not providing an adequate economic impact study. Despite being asked to "provide a property values analysis that was localized to Almer Township," Tuscola "provided property value analyses based on other states, as well as some information concerning *personal* property values in Michigan, but still provided no *real property* value analyses using Michigan data." *Id.* at 6–7 (emphasis in original).

Second, the Board found that the SLUP application did not comply with the Zoning Ordinance's limit on noise emissions. The Board explained that the ordinance's "limitation on noise emissions . . . is clear and unambiguous and requires no further qualifying metric or analysis." *Id.* at 7. In response to Tuscola's argument that an LEQ standard should be utilized, the Board found that "using an Leq standard is inconsistent with the plain and unambiguous language of the Zoning Ordinance, which clearly provides that noise from a WECS 'shall not exceed fortyfive (45) decibels.'" *Id.* at 8. The Board further referenced the opinion of "acoustician Kerrie G. Standlee," who advised the Planning Commission that the language of the Zoning Ordinance would ordinarily be interpreted by acousticians as establishing a maximum noise level limit.

Third, the Board explained that Tuscola had not complied with the ordinance's requirement that an eight-foot security fence be placed around the turbines. The Board acknowledged that Tuscola sought a variance from that requirement from the Planning Commission, but noted that the variance was not approved. And the Board concurred with that decision: "The Township Board also does not approve this alternative, as the Township Board finds that the proposed alternative of having no fence will not adequately protect the public health, safety, and welfare." *Id.* at 10.

Fourth, the Board faulted Tuscola for not providing the turbine safety manual and thus confirming that the turbines are equipped with an adequate braking device: "The Applicant has withheld documentation . . . that would identify the braking device's capability, citing the Applicant's nondisclosure agreement with GE." *Id.* at 10–11.

Fifth, the Board found that Tuscola had not complied with the ordinance's requirement that the electrical lines stemming from the turbines be placed underground. Again, the Board concurred with the Planning Commission's refusal to waive that requirement: "The Township Board . . . does not grant the requested waiver because it finds that the proposed aboveground lines would be

detrimental to the aesthetics of the Township and will not protect the public health, safety, and welfare." *Id.* at 10.

Finally, the Board noted that it had previously approved a moratorium on wind energy projects in the Township and thus was precluded from approving the SLUP application even if it had complied with the Zoning Ordinance.

**2.**

On January 9, 2017, several days after the Planning Commission recommended denial of the SLUP application, Tuscola requested an interpretation of the Zoning Ordinance's 45 dBA limit by the Zoning Board of Appeals ("ZBA"). ZBA Interp. App., ECF No. 30, EX. Z. In the application, Tuscola asked the ZBA to provide expedited review: "Under Section 2401 of the Ordinance, the Township Board must make a decision on Tuscola Wind III's application within 30 days of the Planning Commission's recommendation; in other words, by February 3, 2017. Given that the ZBA's interpretation will be binding on the Township Board, we respectfully request that the ZBA render its interpretation before that date." *Id.* at 4. The ZBA did not give expedited consideration to Tuscola's request. When the Almer Township Board denied the SLUP application, the ZBA appeal had not yet been resolved. Tuscola subsequently withdrew its request for an interpretation of the Zoning Ordinance's provision regarding noise emissions. March 10, 2017, Email, ECF No. 35, Ex. 4.

**III.**

Defendants have now moved for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## IV.

Four of Tuscola's claims remain unresolved. In Count Two, Tuscola argues that the Board's denial of its SLUP application violated Tuscola's procedural due process rights because the Board refused to canvass itself for potential conflicts of interest, did not wait for the ZBA's interpretation of the noise emissions provision in the zoning ordinance, and relied upon the moratorium in denying the SLUP application. In Count Three, Tuscola argues that the Board's denial of its SLUP application violated Tuscola's equal protection rights because the Board treated Tuscola's SLUP application differently than it has treated SLUP applications for other kinds of land uses. In Count Four, Tuscola argues that the moratorium was enacted in violation of the Zoning Enabling Act, M.C.L. § 125.3202(1), because it was passed by resolution and not via the legislative procedures set forth in the ZEA. Finally, in Count Five, Tuscola argues that the Board violated the Open Meetings Act when four newly-elected members "met and deliberated in private" before a public meeting. Compl. at 47. Each claim will be considered in turn.[3]

---

[3] For the reasons stated below, all of Tuscola's pending claims will be dismissed, except for Count Five. The motion in limine seeks to exclude evidence regarding Jim Tussey's ownership of a business that produces significant sound emissions. ECF No. 64. In response, Tuscola argues that the evidence is relevant to its due process and equal protection claims. Pl. Resp. Br. at 2, ECF No. 67. Because those claims will be dismissed, the motion in limine will be denied as moot.

**A.**

Defendants first seek dismissal of Tuscola's procedural due process claim. "To make out a claim for a violation of procedural due process, the plaintiff has the burden of showing that "(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (quoting *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)).

Defendants first argue that Tuscola had no property interest in its SLUP application. "[P]rocedural due-process claims require the deprivation of a liberty or property interest." *Id.* If Defendants have not infringed any property interest possessed by Tuscola, the procedural due process claim must be dismissed.

The question of whether a person has a property interest is generally governed by state law. *Id.* (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). The person must likewise possess "more than a unilateral expectation" of the benefit. *Id.* Rather, the individual must "have a legitimate claim of entitlement." *Hanlon v. Civil Serv. Comm'n*, 253 Mich. App. 710, 723 (2002) (citing *Williams v. Hofley Mfg. Co.*, 430 Mich. 603, 610 (1988)). *See also Roth*, 408 U.S at 577. In the context of planned construction or rezoning requests, "Michigan courts have continually reaffirmed that a building permit and some substantial construction must have commenced before property rights can vest." *Seguin v. City of Sterling Heights*, 968 F.2d 584, 591 (6th Cir. 1992) (citing *Schubiner v. W. Bloomfield Twp.*, 133 Mich. App. 490 (1984) ("Where the building permit has been applied for but has not been issued, 'vested rights' are not acquired even though substantial sums have

been expended by the applicant."). And, importantly, there is "no protected property interest in the" zoning application procedures themselves. *See Pamela B. Johnson Tr. ex rel. Johnson v. Anderson,* No. 315397, 2014 WL 4087967, at *9 (Mich. Ct. App. Aug. 19, 2014) (quoting *Richardson v. Twp. of Brady*, 218 F.3d 508, 518 (6th Cir. 2000)).

Similarly, a pending application for a building permit does not create a property interest where the zoning authorities have discretion to deny the application or limit the use of property. *See EJS Properties, LLC*, 698 F.3d at 856 ("[A] party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary.") (quoting *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002)); *Andreano v. City of Westlake*, 136 F. App'x 865, 871 (6th Cir. 2005) ("A plaintiff lacks a legitimate claim of entitlement or justifiable expectation if a municipality has discretion under its zoning code to deny the plaintiff's land-use application despite the application's compliance with the code's minimum requirements."); *Anderson*, 2014 WL 4087967, at *9 ("[I]f a governmental entity has discretion in its decision-making, a party challenging the decision lacks a legitimate claim of entitlement or a justifiable expectation in the outcome sufficient to create a protected property interest."); *Mettler Walloon, L.L.C. v. Melrose Twp.*, 281 Mich. App. 184, 209 (2008) ("'[O]nce the application for the [Conditional Use Permit] was submitted, Aegis was subject to the inherently unpredictable and often politicized process of seeking permission from a local legislative body to conduct certain activity on a piece of property. In short, Aegis had no protected property interest in having its CUP application granted.") (quoting *Aegis of Arizona, LLC v. The Town of Marana*, 206 Ariz. 557, 569 (Ariz.App. 2003)). On the other hand, "if the board's discretion were so circumscribed that approval of the plaintiff's proposed use of the property became mandatory once

[it] complied with the minimal requirements," then a property interest would exist. *Brown v. City of Ecorse*, 322 F. App'x 443, 445–46 (6th Cir. 2009).

In *Anderson*, the Michigan Court of Appeals held that "the authority exercised by officials in regard to the granting of a request for a special use is wholly discretionary, and thus plaintiff lacks a legitimate claim of entitlement or a justifiable expectation in the outcome." 2014 WL 4087967, at *9. In so holding, the court of appeals relied upon the language of the Michigan Zoning Enabling Act, which expressly provides that zoning officials have discretion to deny special land use applications: "According to MCL 125.3502(4), '[t]he body or official designated to review and approve special land uses *may* deny, approve, or approve with conditions a request for special land use approval.' (emphasis added.) Through its use of the permissive term 'may,' the statute makes plain that the power to grant special use requests is discretionary." *Id.*

The Almer Zoning Ordinance clearly vests the Zoning Board (and Planning Commission) with discretion regarding their consideration of SLUP applications. For example, the Zoning Ordinance provides the general admonishment that "[t]he wind energy conversion system shall not be unreasonably injurious to the public health and safety or to the health and safety of occupants of nearby properties." Zoning Ord. at § 1522(C)(7). *See also id.* at § 1522(C)(23) ("In addition to the other requirements and standards contained in this section, the Planning Commission shall not approve any WECS or Testing Facilities unless it finds that the WECS or Testing Facility will not pose a safety hazard or unreasonable risk of harm to the occupants of any adjoining properties or area wildlife."). Several other sections permit the Planning Commission to waive certain requirements. *See id.* at § 1522(C)(8), (C)(15). Given these discretionary standards, it is clear that approval of a wind energy conversion system SLUP application is *not* mandatory once the minimum requirements of the zoning ordinance are complied with. *See Brown*, 322 F.

App'x at 445–46 (as quoted above). To the contrary, the Planning Commission retains discretion to deny the application if it determines that the project would be "unreasonably injurious to the public health and safety." Zoning Ord. at § 1522(C)(7).

And Tuscola makes no attempt to argue that the Planning Commission lacked discretion to deny the SLUP application. Rather, Tuscola argues, simply, that "TWIII holds leases to develop and use the parcels covered by its SLUP application and therefore has an interest in the use and possession of real estate. That alone suffices to establish a protected property interest." Pl. Resp. Br. at 3, ECF No. 62 (internal citations omitted). The contractual option agreements which Tuscola cites fall far short of establishing a property interest *in the special land-use permit* Tuscola seeks. Rather, the plain language of those contracts makes clear that the property rights vest only when Tuscola exercises the option, which will occur only if Tuscola obtains the permit. In other words, the option agreements are entirely derivative of Tuscola's attempts to obtain a special land use permit. Michigan law requires that "a building permit and some substantial construction must have commenced before property rights can vest," but neither occurred here. *Seguin*, 968 F.2d at 591. The option agreements might constitute a contingent property interest, but Tuscola has simply not identified any way in which the Township's discretionary decision to deny the SLUP application deprived it of the property rights specifically created by those agreements. Indeed, it appears that those option agreements still exist and will remain pending until Tuscola obtains a special land use permit.

And to the extent Tuscola believes it has a property interest in the "Township's determination of TWIII's land use rights," Pl. Resp. Br. at 2, the Sixth Circuit has clearly held that individuals "can have no protected property interest" in the consideration of the SLUP application itself. *See Richardson*, 218 F.3d at 517–18 (rejecting the idea that the plaintiff had a property

interest in "having the Township follow through with its procedures"). *See also Anderson,* 2014 WL 4087967 at *9. Because Tuscola has not identified a protected property interest which the Township has infringed, the procedural due process claim will be dismissed.

**B.**

The Township also seeks dismissal of Tuscola's equal protection claim. In Count Three, Tuscola alleges that the Township's zoning ordinance violates the Equal Protection Clause of the United States and Michigan Constitutions both on its face and as it was applied to them. In particular, Tuscola alleges that

> [t]he Board's decision to deny Tuscola Wind III's SLUP Application because it did not provide a property value analysis that was localized to Almer Township and/or Michigan discriminates against wind energy system developers and participating property owners by imposing oppressive property value impact study restrictions solely on wind energy system SLUP applications and not any other SLUP land use in the Township.

Compl. at 43.

This allegation corresponds to § 1522(C)(3) of the Almer Zoning Ordinance, which provides that:

> *At the Township's request*, the applicant shall fund an economic impact study for review by the Township of the area affected by the WECS. Such study or report shall be provided to the Township prior to the time when the Planning Commission makes its final decision regarding the Special Use request. Such a study shall include probable financial impact as to jobs, tax revenue, lease payments and property values.

(emphasis added).

Under the Equal Protection Clause of the Constitution, "[t]he states cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (internal citations omitted).

Here, Tuscola admits that "TWIII is not a suspect class, nor is TWIII seeking to exercise a fundamental right." Pl. Resp. Br. at 10. Rather, Tuscola is relying on the so-called "class-of-one" theory. *Id.* at 10–11.

"Equal protection claims can be brought by a 'class of one,' where the plaintiff alleges that the state treated the plaintiff differently from others similarly situated and that there is no rational basis for such difference in treatment." *Warren v. City of Athens, Ohio*, 411 F.3d 697, 710 (6th Cir. 2005) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). There are thus two elements to a class-of-one theory: (1) the government treated the plaintiff differently from a similarly situated party and (2) the government had no rational basis for doing so. *See EJS Properties, LLC*, 698 F.3d at 864–65. In considering the first element, "courts should not demand exact correlation, but should instead seek relevant similarity." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000). As to the second element, a "plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by 'negativ[ing] every conceivable basis which might support' the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren*, 411 F.3d at 711 (quoting *Klimik v. Kent County Sheriff's Dept.*, 91 Fed. App'x. 396, 400 (6th Cir. 2004)).

**1.**

As an initial matter, there is some reason to believe that equal protection claims premised on a class of one theory are unavailable as a matter of law in the SLUP application context. In *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 602 (2008), the Supreme Court discussed in detail its decision which first recognized the class-of-one theory, *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The Court explained: "Recognition of the class-of-one theory of equal protection on the facts in *Olech* was not so much a departure from the principle that the Equal Protection

Clause is concerned with arbitrary government classification, as it was an application of that principle." *Engquist*, 553 U.S. at 602.

However, the Supreme Court went on to identify considerable limitations on the scope and availability of the class-of-one theory. First, the Court discussed certain foundational assumptions which the *Olech* opinion was predicated on:

> What seems to have been significant in *Olech* and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. There was no indication in *Olech* that the zoning board was exercising *discretionary authority based on subjective, individualized determinations*—at least not with regard to easement length, however typical such determinations may be as a general zoning matter.

*Id.* at 602–03 (emphasis added).

Second, the Court explained that, where that clear standard is missing, the class-of-one theory may be unavailable:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id.*

The Supreme Court went on to conclude that "the class-of-one theory of equal protection . . . is simply a poor fit in the public employment context." *Id.* at 605. That is true because "employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Id.* at 604. The Supreme Court has not revisited the scope of the class-of-one theory, and the Sixth Circuit has yet to conclusively determine the scope of the limitations identified in *Engquist*. That said, the *Engquist* Court expressly recognized

that "subjective, individualized determinations" are "typical" in "zoning matters" (although it concluded that a clear standard existed in *Olech*). *Id.* at 602–03

A number of cases from Sixth Circuit have raised questions regarding the scope of the class-of-one theory after *Engquist*. In *Loesel v. City of Frankenmuth*, the Sixth Circuit explained that "a plaintiff must overcome a 'heavy burden' to prevail based on the class-of-one theory." 692 F.3d 452, 462 (6th Cir. 2012) (citing *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty., Ohio*, 430 F.3d 783, 791 (6th Cir. 2005) (concluding that the plaintiff "had not carried its heavy burden of negativing every conceivable basis for the Board's decision")). The Sixth Circuit explained: "Class-of-one claims are generally viewed skeptically because such claims have the potential to turn into an exercise in which juries are second-guessing the legislative process." *Id.* at 461.[4] In *Loesel*, the Court quoted a particularly apt passage from a Tenth Circuit case:

> In the wake of *Olech*, the lower courts have struggled to define the contours of class-of-one cases. All have recognized that, unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.

*Jennings v. City of Stillwater*, 383 F.3d 1199, 1210–11 (10th Cir. 2004).

---

[4] *But see EJS Properties, LLC*, 698 F.3d at 864 n. 15 (citing *Engquist* and noting that the Sixth Circuit has not "decided in a published opinion whether this reasoning should extend to other discretionary acts" and declining to address the question); *Franks v. Rubitschun*, 312 F. App'x 764, 766 & n.3 (6th Cir. 2009) (recognizing that the Seventh Circuit has read *Engquist* broadly "to suggest that individualized, discretionary decisions can rarely, if ever, be challenged in class-of-one actions" but suggesting without squarely holding that *Engquist*'s rationale should be limited to the public-employment context). *Franks* predates the *Loesel* opinion, but *ELS Properties* does not. The Sixth Circuit has not expressly reconciled these competing viewpoints.

As discussed above, planning commission members wield a considerable amount of discretion in considering SLUP applications for wind energy conversion systems. The same is true of SLUP applications generally. The Almer Zoning Ordinance introduces its provisions on special land uses by explaining that:

> such special uses are not permitted to be engaged in within the particular zone in which they are listed unless and until the Township Board *in its absolute discretion*, is satisfied that the following minimal standards are met in addition to those specified for a particular special use:

> 1. That the establishment, maintenance or operation or the special use will not be detrimental to or endanger the public health, safety or general welfare.

> 2. That the special use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purpose already permitted, nor shall it substantially diminish and impair property values within its neighborhood.

> 3. That the establishment of the special use will not impede the normal and orderly development and improvement of the surrounding property for uses permitted in the district.

Zoning Ordinance at § 2400 (emphasis added).

The same is true of the specific requirement which Tuscola challenges in Count Three. As explained above, Tuscola takes issue with the Township's requirement that it submit an economic impact study, pursuant to § 1522(C)(3) of the zoning ordinance. That requirement is triggered only at the Township's request, and thus is a manifestly discretionary requirement. Similarly, § 2400 of the zoning ordinance vests the Township Board with "absolute discretion" to require a SLUP applicant to demonstrate that the special use will not "substantially diminish and impair property values within its neighborhood."

In other words, the Township is vested with complete discretion regarding whether to require applicants to provide information regarding the economic impact of a special land use. Tuscola argues that "the only special land use that requires the applicant to provide an economic

impact study is a [wind energy conversion system]." Pl. Resp. Br. at 13. Perhaps that is true in practice, despite the fact that the zoning ordinance vests the Township with authority to ask for such a study for any special land use application. But Tuscola identifies only two examples of previous SLUP petitions in the Township which were approved without the Township requiring a property value or economic impact study: two applications for leave to build a cell tower. *Id.* Three data points are insufficient to establish a statistically significant trend, much less the kind of "clear standard" the Supreme Court relied upon in *Olech*.

The significant discretion entrusted to the Township and the extremely limited number of specifically identified comparable data points highlights the unsuitability of the class-of-one theory in this situation. Indeed, Tuscola's suit constitutes an invitation for this Court to serve as a "general-purpose second-guesser[] of the reasonableness of" the Township's SLUP review process. *Jennings*, 383 F.3d at 1211. The Court is unpersuaded that the Supreme Court intended to raise disputes over the reasonableness of inherently discretionary zoning decisions to constitutional significance. Nevertheless, because the availability of the class-of-one theory in this context has not been clearly rejected by the Sixth Circuit, Tuscola's claim will be reviewed under the traditional standard. The *Loesel* opinion does make clear, however, that Tuscola must overcome a heavy burden to prevail on this claim.

**2.**

The first question is whether Tuscola was treated differently than similarly situated SLUP applicants. As indicated above, exact similarity is not required. Rather, Tuscola has "the burden of demonstrating that [it] was treated differently than other property owners who were similarly situated in *all material respects*." *Loesel*, 692 F.3d at 462 (citing *TriHealth*, 430 F.3d at 790) (emphasis in original). "Materiality is an integral element of the rational basis inquiry. Disparate

treatment of similarly situated persons who are dissimilar only in immaterial respects is not rational. Conversely, disparate treatment of persons is reasonably justified if they are dissimilar in some material respect." *TriHealth*, 430 F.3d at 790. "Inevitably, the degree to which others are viewed as similarly situated depends substantially on the facts and context of the case." *Jennings*, 383 F.3d at 1214. For that reason, "determining whether individuals are similarly situated is generally a factual issue for the jury." *Loesel*, 692 F.3d at 462 (internal citations omitted).

"[T]iming and context" are especially relevant to the similarly-situated inquiry, especially in the zoning context. *See Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 836 (6th Cir. 2009) (citing *Cordi–Allen v. Conlon*, 494 F.3d 245, 253 (1st Cir. 2007)). The *Taylor* Court quoted the following passage from *Conlon*:

> In the land-use context, timing is critical and, thus, can supply an important basis for differential treatment. . . . [C]ourts must be sensitive to the possibility that differential treatment—especially differential treatment following a time lag—may indicate a change in policy rather than an intent to discriminate. Consequently, the most reliable comparisons are likely to be from roughly the same time frame.

*Id.* at 836–37 (quoting *Conlon*, 494 F.3d at 253).

In *Taylor*, the Sixth Circuit questioned whether the plaintiff had shown that it was treated differently from similarly situated developers: "[E]ven if Plaintiff is correct that it was treated differently than developers had been treated in the past, the election of a new mayor and a new City Council—with new priorities—belies any assertion that Plaintiff and the prior developers were similarly situated." *Id.* at 837.

Tuscola argues that, "[a]t the very least, TWIII is similarly situated to communication towers." Pl. Resp. Br. at 12.[5] Tuscola asserts that "the Township has previously approved SLUPs

---

[5] As noted by the Sixth Circuit in *Loesel*, care must be taken to ensure a proper comparison when undertaking the similarly-situated analysis. *See Loesel* 692 F.3d at 463 ("The relevant question, however, should be framed in terms of the properties and their owners, not in terms of the stores located on those properties."). In this matter, the proper comparison would be between Tuscola and other companies applying for SLUP applications in the Township, and

for 2 cell towers, [but] did not require a property value or economic impact study for these towers. *Id.* at 13. Tuscola has provided no information regarding the companies which submitted the SLUP applications for those towers nor any information regarding the SLUP applications themselves. Given this minimal factual proffer, it is unclear that Tuscola has satisfied its burden of demonstrating that it was treated differently than similarly situated SLUP applicants. *See Loesel*, 692 F.3d at 462.

And, regardless, there are clear and obvious differences between SLUP applications for leave to construct nineteen wind turbines and SLUP applications to construct one cell tower. The first and most obvious difference is the number of large structures to be built. A single cell tower will impact only a small part of the Township, while nineteen wind turbines will have a much larger footprint. Another relevant difference between wind turbines and cell towers is the fact that wind turbines include large moving parts, while cell towers do not. In considering the SLUP application, the Township required extensive documentation regarding "shadow flicker," which is a potential negative only for wind turbines. The Township also expressed concern regarding the potential danger to birds which giant spinning blades might pose. Relatedly, wind turbines produce consistent sound (a fact that produced the primary dispute during the SLUP review process). Tuscola has provided no evidence that cell towers do the same.[6] Each of these differences would

---

SLUP applications for wind energy conversions systems and SLUP applications for other projects (like communications towers).

[6] In fact, Tuscola provides only one source to support its assertion that cell towers create similar safety issues, a link to the Occupational Safety and Health Administration's section regarding communication towers. *See* https://www.osha.gov/doc/topics/communicationtower/index.html. That page discusses "frequently encountered hazards," almost all of which include dangers to the employees working on the towers, not nearby landowners. *Id.* The only identified safety hazard which communication towers pose to nearby landowners is the structural collapse of towers. *Id.*

be a relevant factor in considering the probable economic impact of a wind energy conversion system.

Finally, even setting aside the differences between SLUP applications to construct cell towers and SLUP applications to construct wind turbines, Tuscola has not provided any information regarding when those SLUP applications were approved. Given the election of new board members which precipitated the SLUP denial in this case, it is likely that the cell tower SLUP applications were approved by a different Board. Thus, the decision to require Tuscola to provide an economic impact report may be a function of "'a change in policy rather than an intent to discriminate.'" *Taylor*, 313 F. App'x at 836 (citing *Conlon*, 494 F.3d at 253).[7]

Tuscola has identified only limited evidence of similarly situated SLUP applicants. This evidence falls short of satisfying the "heavy burden" which Tuscola must overcome to prevail on its equal protection claim. *Loesel*, 692 F.3d at 462. Nevertheless, in recognition of the extremely fact-bound nature of the similarly-situated analysis, the second element of the class-of-one theory will also be briefly considered.

**3.**

If a plaintiff demonstrates that it was treated differently from similarly situated individuals, the next question is whether that difference in treatment had a rational basis. Statutes are

---

[7] Tuscola argues, broadly, that the Almer Zoning Ordinance violates the Equal Protection Clause on its face because "the only special land use that requires the applicant to provide an economic impact study is a [wind energy conversion system]." Pl. Resp. Br. at 13. That is simply wrong. As explained in detail above, the zoning ordinance requires an economic impact study for wind energy SLUP applications only when requested by the Township. In other words, the Township has discretion to require a study. And the Township similarly has "absolute discretion" to require other SLUP applicants to provide information which confirms that the special land use will not "diminish and impair property values within its neighborhood." Zoning Ordinance at § 2400. In other words, the zoning ordinance empowers the Township to require information regarding economic impact for all kinds of SLUP applications, but leaves that decision to the discretion of the Township. Tuscola has provided no basis for its puzzling argument that the zoning ordinance *on its face* treats wind energy special uses differently from other kinds of special uses, at least when it comes to economic impact data. Rather, Tuscola's only examples of disparate treatment come from the application of the zoning ordinance to specific SLUP applications (i.e., the Township exercised its discretion to require an economic impact study for Tuscola's SLUP application, but not for the cell tower SLUP applications).

invalidated for lacking a rational basis only extremely rarely. "Even foolish and misdirected provisions are generally valid if subject only to rational basis review." *Craigmiles v. Giles*, 312 F.3d 220, 223–24 (6th Cir. 2002). "A proffered [sic] explanation for the statute need not be supported by an exquisite evidentiary record; rather we will be satisfied with the government's 'rational speculation' linking the regulation to a legitimate purpose, even 'unsupported by evidence or empirical data.'" *Id.* (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). There a numerous rational bases on which the Township could have based its decision to require Tuscola to submit an economic impact report and but not require similar reports from other SLUP applicants. Those bases were summarized above in the similarly situated analysis. And when wind turbines are compared to other kinds of special uses, like churches or golf courses, the distinguishing characteristics of wind energy conversion systems become even more stark.[8]

The remaining question is whether the Township's decision to require an economic impact study (and to reject the studies Tuscola provided as being insufficiently specific) was motivated by animus. Importantly, Tuscola must identify animus directed against it, not just against the idea of having a wind energy development in the Township. *See Loesel*, 692 F.3d at 467 ("Although the Loesels presented abundant evidence showing that certain City officials, such as City Manager Graham, strongly opposed having a Wal–Mart supercenter in Frankenmuth, the animus had to be directed against the Loesels to be relevant to their claim."). *See also Ziss Bros. Const. Co. v. City of Indep., Ohio*, 439 F. App'x 467, 479 (6th Cir. 2011) ("Plaintiff's allegations of animosity towards Plaintiff's Preliminary Plan do not constitute animus sufficient to undermine the

---

[8] Tuscola also faults the Township for rejecting its economic studies because they were not specific to the Township. Tuscola argued in the SLUP application (and now) that an Almer Township specific study was unnecessary. But the Township's decision to require Almer-specific economic impact data was not irrational. As noted above, the zoning ordinance requires the Township Board to inquire into whether the proposed development would impact "the area affected by the WECS." Almer Zoning Ord., § 1522(C)(3). The same is true of SLUP applications generally. *See id.* at § 2400(2). Tuscola has consistently argued that such a study would be statistically suspect, but statistical rigor is not required to satisfy rational basis review.

- 28 -

Commission's decision on rational basis review. The animus must be directed toward the class alleged."); *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 837–38 (6th Cir. 2009) ("To demonstrate animus or ill-will, 'a plaintiff must prove that the challenged government actions were motivated by personal malice *unrelated to the defendant's official duties.*'") (quoting *Klimik v. Kent County Sheriff's Dep't*, 91 F. App'x. 396, 401 (6th Cir. 2004) (emphasis in original)). This requirement that the plaintiff identify personal animus unrelated to official duties or policy is important because otherwise "the federal courts would be drawn deep into the local enforcement of petty state and local laws." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000).

Tuscola has simply identified no evidence which suggests that any Township official possessed animus against the company specifically which was unrelated to an opposition to wind energy generally or their official duty to ensure compliance with the zoning ordinance. In fact, Tuscola alleges in their complaint that the opposition to Tuscola in the Township originated from "an anti-wind organization based in Toledo, Ohio, called the Interstate Informed Citizens Coalition." Compl. at 10. That organization "opposes wind as a matter of policy and lobbies against wind energy in Ohio and Michigan." *Id.* Tuscola believes that "four active members" of the local chapter of the interstate coalition were elected to the Township Board in the 2016 election and are responsible for the denial of the SLUP application. Compl. at 11–12.

Tuscola provides numerous examples of heated debate during public hearings regarding wind energy. *See* Pl. Resp. Br. at 15–17. Tuscola recounts two instances where members of the anti-wind group insulted or threatened members of the public and Tuscola employees during public hearings. *Id.* at 15–16. But the identified speakers are not Township officials, and any animus which a public citizen might have against Tuscola is simply irrelevant to this suit.

Tuscola also relies upon several statements by Township Board members. For example, they cite to an email where Board Member Tussey asserted that the $3.1 million which the Township would receive over the life of the proposed wind development project "[h]ardly makes up for ruining many homes and taking away future economic benefits because no one and no business wants to be next to a turbine or future turbine." Oct. 11, 2016, Email, ECF No. 62, Ex. 9. Tuscola also relies upon a Facebook post by Board Member Art Graff where he accused "the turbine companies" of withholding information about wind energy and stated that "[i]f one stands by and watch a crime being committed and does NOTHING about it they are as guilty as the person committing the crime." Facebook Post, ECF No. 62, Ex. 10.

These examples merely demonstrate that members of the Township Board are ideologically opposed to wind energy. That idea is unremarkable. Tuscola itself has repeatedly argued that numerous members of the Board ran for election in 2016 for the express purpose of preventing any wind energy development in the Township. That idea is buttressed by the allegation that those Board Members are associated with an interstate coalition which opposes wind energy. But vehement and heated disputes over the efficacy and wisdom of certain policies are an expected, natural part of the democratic process. Members of the Township Planning Commission and Board have a professional obligation to not only ensure that the requirements of the zoning ordinance are complied with, but to use their best judgment and discretion to protect the Township from harmful developments. Tuscola and the Township disagree over whether the proposed wind energy development would be harmful, but a disagreement over policy is not reflective of unconstitutional animus. Indeed, none of the evidence relied upon by the Township supports the idea that any Township official has animus towards Tuscola which is unrelated to the proposed SLUP application. All of the conflict between the Township and Tuscola can be traced to Tuscola's desire

to build a wind energy development and the Township Board's opposition to wind energy. Tuscola has identified no "personal malice unrelated to the defendant's official duties." *Taylor Acquisitions, L.L.C.*, 313 F. App'x at 838 (emphasis omitted). Tuscola's equal protection claim has no merit.

**C.**

Next, the Township argues that Tuscola's fourth claim should be dismissed. In Count Four, Tuscola alleges that the Township violated the Zoning Enabling Act when it enacted a moratorium on consideration of all SLUP applications regarding wind energy projects. In its appeal from the Township Board's denial of the SLUP application, Tuscola also challenged the validity of the moratorium. The Court refused to consider the validity of the moratorium:

> Although the moratorium on wind energy projects was enacted after Tuscola's SLUP application was submitted (but before it was rejected), the Planning Commission and Township Board proceeded to consider the SLUP application on its merits. At most, the Township Board relied upon the moratorium as an alternative (and secondary) basis for denying the SLUP application. Because the Board's denial of the application was supported by substantial evidence and was not contrary to law, the legitimacy of the moratorium need not be resolved.

Nov. 3, 2017, Op. & Order at 32 n.9, ECF No. 39.

On October 10, 2017, the Township Board extended the moratorium for another six months. Oct. 10, 2017, Resolution to Extend, ECF No. 55, Ex. E. The moratorium is presently set to expire on June 13, 2018.

Tuscola argues that the Court should declare the moratorium void, notwithstanding the fact that the Township's denial of the SLUP application has been upheld, because "the Township relied on the Moratorium as an independent reason for denying TWIII's Application." Pl. Resp. Br. at 19. Tuscola further argues that "the Moratorium (and its extension) have prevented TWIII from

reapplying under the Ordinance and providing additional information to support a new application." *Id.*

Neither explanation is sufficient to provide this Court jurisdiction to adjudicate the claim. As to the first, the Township's SLUP application has been denied, and that denial has been affirmed by this Court. Nov. 3, 2017, Op. & Order. Tuscola seeks an order invalidating the moratorium, but such an order would do nothing to redress Tuscola's alleged injury: the denial of the application. "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Alvarez v. Smith*, 558 U.S. 87, 93 (2009)). Simply put, an order invalidating the moratorium would have no effect on Tuscola's prior SLUP application, and so the challenge to the moratorium on that basis is moot.

Similarly, Tuscola's assertion that the moratorium has prevented it from reapplying does not suffice to provide a basis for jurisdiction. Federal courts "have no power to offer an advisory opinion, based on hypothetical facts." *Commodities Exp. Co. v. Detroit Int'l Bridge Co.*, 695 F.3d 518, 525 (6th Cir. 2012). In the absence of an actual SLUP application, Tuscola's concerns over the availability of the moratorium are merely hypothetical. The Township Board could have relied on the moratorium to refuse consideration of Tuscola's prior SLUP application, but chose to review that application on the merits. Tuscola has provided no reason to believe that a second SLUP application would be treated differently. In the absence of a pending SLUP application, any challenge to the validity of a legislative action bears the appearance of a suit premised on taxpayer standing. *See Flast v. Cohen*, 392 U.S. 83, 102 (1968) (explaining why such suits are generally

nonjusticiable). A decision regarding the validity of the moratorium would thus constitute an advisory opinion.

## D.

The final claim to resolve is Tuscola's allegation that several Township Board members violated the Michigan Open Meetings Act ("OMA") through private communications and deliberations both before and after being sworn into office. Primarily at issue in this claim is the rather narrow question of whether members-elect of a public body, prior to being sworn in, are subject to the restrictions of the OMA. The Michigan OMA does not specify whether members-elect are considered part of a "public body," as defined by statute, and no Michigan court has addressed this particular issue in the OMA. Pl. Resp. at 20, ECF No. 62. Tuscola also argues that Board members violated the OMA via emails communications *after* being sworn into office.

## 1.

A federal court adjudicating claims premised on state law must "apply state law in accordance with the controlling decisions of the state supreme court." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). "If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data." *Id.* The decisions of state appellate courts should not "'be disregarded unless [the court is] presented with persuasive data that the Michigan Supreme Court would decide otherwise'" *Id.* (quoting *Kingsley Assoc. Moll Plasticrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995)).

The definitions section of the Michigan OMA states in pertinent part:

As used in this act: (a) "Public body" means any state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council, that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or

perform a governmental or proprietary function… (b) "Meeting" means the convening of a public body at which a quorum is present for the purpose of deliberating toward or rendering a decision on a public policy.

M.C.L. 15.262.

"The purpose of the OMA is to promote openness and accountability in government; it is therefore to be interpreted broadly to accomplish this goal." *Booth Newspapers, Inc. v. Univ. of Michigan Bd. of Regents*, 481 N.W.2d 778, 782 (Mich. App. 1992). Properly framed, the question is whether members-elect constitute part of a "public body" as defined in 15.262.

While no Michigan court has interpreted the OMA as it applies to members-elect specifically, Michigan authority does provide guidance. In another context, the Michigan Supreme Court has refused to expand the definition of "public body" beyond the plain language of the statute. *Herald Co. v. City of Bay City*, 614 N.W.2d 873 (Mich. 2000). In *Herald*, the court considered whether the Legislature included individuals in the definition of "public body." The court concluded: "[B]y electing not to include individuals in the definition of public body in the OMA, [the Legislature] has exempted [individuals] from its requirements." *Id.* at 884. In so holding, the court emphasized that courts should avoid unnecessary judicial construction:

> Because our judicial role precludes imposing different policy choices than those selected by the Legislature, our obligation is, by examining the statutory language, to discern the legislative intent that may reasonably be inferred from the words expressed in the statute. If the language of a statute is clear and unambiguous, the plain meaning of the statute reflects the legislative intent and judicial construction is not permitted.

*Id.* at 876 (internal citations omitted).

This reasoning provides a direct analogy to the current matter when "members-elect" is substituted for "individuals," and strongly suggests that members-elect should not be subject to the requirements of the OMA.

**2.**

Several states have addressed this question directly. When it was enacted in 1969, the Florida open meetings law defined those bodies subject to the law using much the same language that the Michigan OMA currently uses:

> All meetings of any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation or any political subdivision, except as otherwise provided in the constitution, at which official acts are to be taken are declared to be public meetings open to the public at all times, and no resolution, rule, regulation or formal action shall be considered binding except as taken or made at such meeting.

Fla. Stat. § 286.011 (1969). In 1973, a Florida appeals court ruled that, although members-elect were not specifically included in the statutory language, members-elect should be subject to the open meetings law. *Hough v. Stembridge*, 278 So.2d 288 (Fla. Dist. Ct. App. 1973). The court reasoned that "to [rule otherwise] would in effect permit . . . members-elect to gather with impunity behind closed doors and discuss matters on which foreseeable action may be taken by that board or commission in clear violation of the purpose, intent, and spirit of the [open meetings] law." *Id.* at 289. In response, the Florida State Legislature amended the law to cover meetings "with or attended by any person elected to such board or commission, but who has not yet taken office." Fla. Stat. § 286.011.

The Rhode Island open meetings law has been interpreted similarly. In 1995, the Attorney General received a complaint from the editor of the Newport Daily News that members-elect of the Newport City Council had gathered in private homes to discuss council business prior to assuming office. *Offer v. Newport City Council*, OM 95-31. In *Offer*, the Attorney General relied upon *Hough* in finding that "members-elect of the Newport City Council fall within the scope of, and are governed by, the Open Meetings Act." *Id.* at 2. This interpretation has been repeatedly affirmed by the Attorney General. *See Schanck v. Glocester, Town Council*, OM 97-03; *The Valley Breeze v. Cumberland Fire Committee*, OM 15-04. The current language of the Rhode Island open

meetings law, like that of the pre-1973 Florida law and the current Michigan law, does not specifically address members-elect: "'Meeting' means the convening of a public body to discuss and/or act upon a matter over which the public body has supervision, control, jurisdiction, or advisory power . . . 'Public body' means any department, agency, commission, committee, board, council, bureau, or authority or any subdivision thereof of state or municipal government." Gen. Laws 1956, § 42-46-2.

Other states have concluded that members-elect are not covered by open meetings laws. Prior to 1994, the California open meetings statute, similar to the current Michigan OMA, did not specifically address members-elect:

> As used in this chapter, "legislative body" means: (a) The governing body of a local agency or any other local body created by state or federal statute. (b) A commission, committee, board, or other body of a local agency, whether permanent or temporary, decisionmaking or advisory, created by charter, ordinance, resolution, or formal action of a legislative body.

Cal. Gov. Code § 54952.

The California Legislature amended the open meetings law specifically to cover members-elect, a change that came into effect in April 1994. *216 Sutter Bay Associates v. County of Sutter*, 68 Cal.Rptr.2d 492, 503 (1997). The court in *Sutter Bay* refused to apply the restrictions of the open meetings law to meetings attended by members-elect in 1992: "There is a fatal legal flaw in this first prong. When incumbent supervisor Licari met with supervisors-elect Akin and Kroon in December 1992, the [Open Meetings Act] did not apply to supervisors-elect, *but only to those who had already assumed office*." *Id.* at 503 (emphasis added). The court held that "[t]he general rule is that when the Legislature amends a statute, its purpose is to change existing law." *Id.* (internal citations omitted). In other words, the court recognized that the legislature's amendment of the law

to include members-elect strongly suggested that the law before the amendment—that is, before 1994—did not cover members-elect.

In 2001, a Washington appeals court considered whether Washington's open meetings law applied to members-elect. *Wood v. Battle Ground School Dist.*, 27 P.3d 1208 (Wash. App. 2001). The court in *Wood* acknowledged that Washington's open meetings law was originally modeled on those of Florida and California. As noted above, the courts in these two states resolved the matter at issue in this case in opposite ways. The *Wood* court followed the rationale in *Sutter Bay*: "Wood contends that applying the OPMA to members-elect is consonant with the legislative purpose. We do not disagree but we concur with the California court that it is 'for the Legislature, not the judiciary, to determine a basic legislative question such as whether [members-elect are] covered.'" *Wood*, 27 P.3d at 1215 (internal citations omitted).[9] The Washington court also asserted: "Although the OPMA defines 'action' broadly, nothing suggests that members-elect have the power to transact a governing body's official business before they are sworn in. Thus, they are not 'members' of a governing body with authority to take 'action.'" *Id.*

### 3.

For several reasons, the best interpretation is that the Michigan OMA does not apply to members-elect. First, the Legislature, not the court, has the prerogative of determining the scope of the OMA. *Wood*, 27 P.3d at 1215 (holding that the Legislature is responsible for "'determin[ing] a basic legislative question such as whether [members-elect are] covered.'"). Second, the Michigan Supreme Court has interpreted the OMA narrowly. *Herald*, 614 N.W.2d at 884 ("[B]y electing not

---

[9] The *Wood* court held that this was a legislative question, not a judicial one, while acknowledging both the construction directive in RCW 42.30.910, which directs that the open meetings act should be construed liberally, and the Legislature's forceful declaration of legislative purpose in RCW 42.30.010. *Wood*, 27 P.3d at 1214–1215; RCW 42.30.010 ("The people of this state do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created.").

to include individuals in the definition of public body in the OMA, [the Legislature] has exempted [individuals] from its requirements."). The Michigan Supreme Court found that the text of the OMA excluded individuals from the definition of "public body" because the Legislature did not include references to individuals in the text of the statute. *Id.* By analogy, and in keeping with the Michigan Supreme Court's directive to avoid unnecessary judicial construction, members-elect are excluded from the definition of "public body." *Id.* at 876.

Finally and most importantly, the Legislature expressly limited the OMA to bodies "empowered . . . to exercise governmental or proprietary authority or perform a governmental or proprietary function." M.C.L. 15.262(a). A "body" comprised of members-elect to a Township Board is not empowered to exercise authority, and therefore falls outside the OMA. M.C.L. § 168.362(1); *Wood*, 27 P.3d at 1215 ("[N]othing suggests that members-elect have the power to transact a governing body's official business before they are sworn in. Thus, they are not 'members' of a governing body with authority to take 'action.'"). Thus, the members-elect of the Almer Township Board were not subject to the OMA before being sworn in on November 20, 2016. Because members-elect are not subject to the OMA, the gatherings that included members-elect of the Almer Township Board—which took place after the election on November 8, 2016, but before the newly-elected members' assumption of office on November 20, 2016—were not "meetings" for purposes of the OMA.

**4.**

Tuscola also argues, very briefly, that "the Board members continued engaging in concealed deliberations *after* they were sworn into office" because the Board implemented an email policy whereby "the members would send an email to themselves and blind carbon copy the remaining Board members." Pl. Resp. Br. at 24. In support of this assertion, Tuscola cites two

exhibits. The first exhibit contains two December 2016 emails from Jim Mantey in which Mr. Mantey articulated the change in procedure. Mantey Emails, ECF No. 62, Ex. 20. The second exhibit contains an December 26, 2016, email from Jim Tussey wherein the entire Almer Board is blind carbon copied. Tussey Email, ECF No. 62, Ex. 21. In the email, Tussey discussed certain outstanding questions regarding Tuscola's SLUP application. None of the email chains which Tuscola identifies involve any replies by other Board members or any indication that a discussion chain resulted.

Neither party has identified any Michigan authority which discusses whether and how the OMA applies to email communications. To the Court's knowledge, only one such case exists. In *Markel v. Mackley*, 2016 Mich App. LEXIS 2004, the Michigan Court of Appeals concluded that emails communications could violate the OMA. In *Markel*, the defendants argued that the OMA was not violated because the email communications did not involve a quorum of commissioners and because not all recipients of the emails participated in the discussions. The court of appeals rejected both arguments.

The court explained that "it is plain that, even where a quorum of individuals are present at a given nonpublic meeting, that does not necessarily mean that there is a violation of the OMA." *Id.* at *8 (citing *Ryant v. Cleveland Twp.*, 608 N.W.2d 101, 104 (2000)). But the *Markel* Court explained that the OMA simply requires that a "quorum is present . . . for the purpose of deliberating." *Id.* at *10 (citing M.C.L. § 15.262(b)). Thus, the *Markel* Court rejected the idea that the statute requires "the entire quorum to actively engage in the discussion." Rather, the OMA can be violated by simply "some level of discourse on the issue of public policy that is being presented." *Id.* at *11. As the court of appeals explained, imposing a requirement that every member participate in the discussions "would allow public bodies to forego the requirements of

the OMA by merely having certain members of the quorum read the emails but remain silent" and thus foil the underlying purposes of the OMA. *Id.* Ultimately, the court of appeals in *Markel* held that "whether 'a quorum is present for the purpose of deliberating toward a decision' when only some commissioners in the email chain respond to a message is often a question of fact." *Id.* In so holding, the court also noted that "even when a defendant did not affirmatively reply to an email, their tacit agreement was later demonstrated at the public meetings by acting consistently with decisions made in the emails." *Id.* at *12.

When the rationale in *Markel* is applied to the present facts, it is clear that genuine issues of material fact exist. The attached emails clearly support a finding that members of the Board repeatedly emailed all members via blind carbon copy. Merely emailing all members does not violate the OMA unless there was some level of discourse on an issue of public policy. And neither of the exhibits cited by Tuscola contain discourse between multiple members. But the emails strongly suggest that the procedure was adopted in order to facilitate communication between the Board. And, as the *Markel* Court recognized, the fact that Board members may have later acted consistently with emails they did not reply to suggests that some level of participation in deliberation occurred. *Id. See also id.* ("This is especially true where there was evidence that defendants intended to subvert the OMA, as noted by the trial court, and at least one commissioner was advised against sending emails that included a quorum of the PRC actively deliberating. ").

In short, the emails identified by Tuscola do not clearly constitute violations of the OMA. None of the identified email chains involve replies by other commissioners, and no evidence has been presented to suggest that Board members later made decisions at public meetings in reliance on information received by email. But the identified emails do identify a procedure which expressly contemplated communications which could violate the OMA. And, importantly, Tuscola

does not bear the burden of proving that an OMA violation occurred at this stage. Rather, in order to justify summary judgment, the Township must show that no violation occurred as a matter of law. Given the Township's threadbare briefing on this issue and the outstanding factual questions, the Township has not met that burden. Tuscola's OMA claim will be dismissed in part.

**V.**

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment, ECF No. 55, is **GRANTED in part.**

It is further **ORDERED** that Defendants' motion in limine, ECF No. 64, is **DENIED as moot.**

It is further **ORDERED** that Counts Two, Three, and Four of Plaintiff Tuscola's complaint, ECF No. 1, are **DISMISSED.**

It is further **ORDERED** that Count Five of Plaintiff Tuscola's complaint, ECF No. 1, is **DISMISSED in part.** Plaintiff Tuscola's claim that members-elect to the Board violated the Opening Meetings Act is dismissed, but the claim that Board members violated the Open Meetings Act through email communications after taking office remains pending.


Dated: June 12, 2018                                  s/Thomas L. Ludington
                                                      THOMAS L. LUDINGTON
                                                      United States District Judge


<table>
<tr><td>

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 12, 2018.

                    s/Kelly Winslow
                    KELLY WINSLOW, Case Manager

</td></tr>
</table>